NATIONAL FOREIGN TRADE COUNCIL, Plaintiff, Appellee,

v.

Andrew S. NATSIOS, in his official capacity as Secretary of Administration and Finance of the Commonwealth of Massachusetts, and Philmore Anderson, III, in his official capacity as State Purchasing Agent for the Commonwealth of Massachusetts, Defendants, Appellants.

No. 98–2304.

United States Court of Appeals, First Circuit.

Heard May 4, 1999.

Decided June 22, 1999.

39

Thomas A. Barnico, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, and James A. Sweeney, Assistant Attorney General, were on brief, for appellants.

Timothy B. Dyk, with whom Gregory A. Castanias, Jones, Day, Reavis & Pogue, Michael A. Collora, and Dwyer & Collora were on brief, for appellee.

Jonathan P. Hiatt and Deborah Greenfield on brief for amicus curiae American Federation of Labor and Congress of Industrial Organizations.

Loretta M. Smith, Cynthia L. Amara, and New England Legal Foundation on brief for amici curiae Associated Industries of Massachusetts and Retailers Association of Massachusetts.

Zach Cowan, Acting City Attorney, and Christopher Alonzi, Deputy City Attorney, on brief for amicus curiae City of Berkeley, California.

Martin S. Kaufman, Edwin L. Lewis, III, and Atlantic Legal Foundation, Inc. on brief for amici curiae William E. Brock, Sam M. Gibbons, Alexander M. Haig, Jr., Lee H. Hamilton, Carla A. Hills, George P. Shultz, and Clayton Yeutter.

Deborah E. Anker, Peter Rosenblum, Anusha Rasalingam, and Harvard Law School Immigration and Refugee Clinic on brief for amici curiae Center for Constitutional Rights, Citizens for Participation in Political Action, The International Labor Rights Fund, The New England Burma Roundtable, and The Unitarian Universalist Service Committee.

Daniel M. Price, Powell, Goldstein, Frazer & Murphy LLP, Robin S. Conrad, National Chamber Litigation Center, Inc., Jan Amundson, and Quentin Riegel on brief for amici curiae Chamber of Commerce of the United States of America, Organization for International Investment, National Association of Manufacturers, United States Council for International Business, American Insurance Association, American Petroleum Institute, and American Farm Bureau Federation.

Sara C. Kay, Associate General Counsel, Office of the Comptroller of the City of New York, on brief for amici curiae the Comptroller of the City of New York, the Cities of Los Angeles, California, Philadelphia, Pennsylvania, Oakland, California, Boulder, Colorado, Santa Cruz, California, and Newton, Massachusetts, the Towns of Amherst, Massachusetts and Carrboro, North Carolina, the City and County of San Francisco, California, and the County of Alameda, California.

George A. Hall, Jr. and Anderson & Kreiger LLP on brief for amici curiae Consumer's Choice Council, American Lands Alliance, Preamble Center, Institute for Agriculture and Trade Policy, Friends of the Earth, Humane Society of the United States, Defenders of Wildlife, and Rainforest Relief.

Richard L. Herz and Steven B. Herz on brief for amicus curiae EarthRights International.

Richard L.A. Weiner, David G. Leitch, Gil A. Abramson, and Hogan & Hartson L.L.P. on brief for amici curiae The European Communities and Their Member States.

Robert Stumberg, Matthew Porterfield, and Harrison Institute for Public Law, Georgetown University Law Center on brief for amici curiae Members of Congress Sen. Edward Kennedy, Rep. David Bonior, Rep. Sherrod Brown, Rep. Michael Capuano, Rep. Peter DeFazio, Rep. William Delahunt, Rep. Lane Evans, Rep. Barney Frank, Rep. Marcy Kaptur, Rep. Dennis Kucinich, Rep. Edward Markey, Rep. James McGovern, Rep. Martin Meehan, Rep. Joseph Moakley, Rep. George Miller, Rep. Richard Neal, Rep. Robert Ney, Rep. John Olver, Rep. Ileana Ros-Lehtinen, Rep. Bernard Sanders, Rep. Janice Schakowsky, Rep. Christopher Smith, Rep. Ted Strickland, Rep. John Tierney, Rep. James Traficant, and Rep. Henry Waxman.

Charles Clark, W. Thomas McCraney, III, and Watkins & Eager, PLLC on brief for amici curiae Members of Congress Sen. Richard G. Lugar, Sen. Rod Grams, Sen. Craig Thomas, Sen. Pat Roberts, Rep. Calvin Dooley, Rep. Donald Manzullo, Rep. Amory Houghton, Rep. Michael G. Oxley, Rep. Doug Bereuter, and Rep. David Dreier.

Heidi Heitkamp, Attorney General of North Dakota, Bill Lockyer, Attorney General of California, J. Joseph Curran, Jr., Attorney General of Maryland, Philip T. McLaughlin, Attorney General of New Hampshire, Patricia A. Madrid, Attorney General of New Mexico, Eliot Spitzer, Attorney General of New York, John Cornyn, Attorney General of Texas, Hardy Myers, Attorney General of Oregon, and William H. Sorrell, Attorney General of Vermont, on brief for amici curiae States of North Dakota, California, New York, Texas, Oregon, New Mexico, New Hampshire, Vermont, and Maryland.

Daniel J. Popeo, R. Shawn Gunnarson, Evan Slavitt, and Gadsby & Hannah LLP on brief for amici curiae The Washington Legal Foundation, American Legislative Exchange Council, Rep. George N. Katsakiores, Rep. Howard L. Fargo, and New York State Assemblyman Clifford W. Crouch.

Before LYNCH, Circuit Judge, COFFIN and CYR, Senior Circuit Judges.

LYNCH, Circuit Judge.

The Commonwealth of Massachusetts appeals from an injunction restraining en-

forcement of the Massachusetts Burma Law, which restricts the ability of Massachusetts and its agencies to purchase goods or services from companies that do business with Burma.[1] We affirm the district court's finding that the law interferes with the foreign affairs power of the federal government and is thus unconstitutional. We also find that the Massachusetts Burma Law violates the Foreign Commerce Clause. We further find that the Massachusetts Burma Law violates the Supremacy Clause because it is preempted by federal sanctions against Burma. We affirm the injunction issued by the district court.

There is one matter on which the parties are agreed: human rights conditions in Burma are deplorable. This case requires no inquiry into these conditions.

## I

### 1. The Massachusetts Burma Law

In 1996, Massachusetts enacted "An Act Regulating State Contracts with Companies Doing Business with or in Burma (Myanmar)," ch. 130, 1996 Mass. Acts 239 (codified at Mass. Gen. Laws ch. 7, §§ 22G–22M, 40F½ (West Supp.1998)) ("Massachusetts Burma Law"). The law restricts the ability of Massachusetts and its agencies and authorities[2] to purchase goods or services from individuals or companies that engage in business with Burma. The law requires the Secretary of Administration and Finance to maintain a "restricted purchase list" of all firms engaged in business with Burma. Mass. Gen. Laws ch. 7, § 22J. As the district court explained, companies may challenge inclusion on the list by submitting an affidavit stating that they do no business with Burma, but final determination as to whether a company is in fact "doing business" as defined by the law is made by the Executive Office's Operational Services Division. *See National Foreign Trade Council v. Baker*, 26 F.Supp.2d 287, 289 (D.Mass.1998).

Under the law, Massachusetts and its agencies and authorities may not contract

---

**1.** Burma changed its name to Myanmar in 1989. However, because the parties and amici curiae in this case have largely used the name Burma, the statute at issue is known as the Massachusetts Burma Law, and the federal law refers to Burma, we use Burma throughout this opinion. This device is meant only for the ease of the reader and is not intended to express any view regarding the name Myanmar.

**2.** The law defines "[s]tate agency" to include "all awarding authorities of the commonwealth, including, but not limited to, all executive offices, agencies, departments, commissions, and public institutions of higher education, and any office, department or division of the judiciary." Mass. Gen. Laws ch. 7, § 22G. The law defines "state authorit[ies]" to "include, but not be limited to" the following:

> Bay State Skills Corporation, centers of excellence, Community Economic Development Assistance Corporation, Community Development Finance Corporation, Government Land Bank, Massachusetts Bay Transportation Authority, Massachusetts Business Development Corporation, Massachusetts Capital Resource Company, Massachusetts Convention Center Authority, Massachusetts Corporation for Educational Telecommunications, Massachusetts educational loan authority, Massachusetts Health and Educational Facilities Authority, Massachusetts Higher Education Assistance Corporation, Massachusetts Housing Finance Agency, Massachusetts Horse Racing Authority, Massachusetts Industrial Finance Agency, Massachusetts Industrial Service Program, Massachusetts Legal Assistance Corporation, Massachusetts Port Authority, Massachusetts Product Development Corporation, Massachusetts Technology Development Corporation, Massachusetts Technology Park Corporation, Massachusetts Turnpike Authority, Massachusetts Water Resources Authority, Nantucket Land Bank, New England Loan Marketing Corporation, pension reserves investment management board, State College Building Authority, Southeastern Massachusetts University Building Authority, Thrift Institutions Fund for Economic Development, University of Lowell Building Authority, University of Massachusetts Building Authority, victim and witness board, and the Woods Hole, Martha's Vineyard, and Nantucket Steamship Authority.
>
> *Id.*

with companies on the restricted purchase list except in three situations: when procurement of the bid is essential and there is no other bid or offer, when the Commonwealth is purchasing certain medical supplies, or when there is no "comparable low bid or offer." Mass. Gen. Laws ch. 7, § 22H. The law defines a "[c]omparable low bid or offer" as an offer equal to or less than ten percent above a low bid from a company on the restricted purchase list. *Id.* § 22G. In practice, the law means that in most cases a company on the restricted purchase list can sell to Massachusetts only if the company's bid is for all practical purposes ten percent lower than all bids by companies not on the restricted purchase list. Before a company can bid on a Massachusetts contract, the law requires it to provide a sworn declaration disclosing any business it is doing with Burma. *See id.* § 22H.

The law defines "doing business with Burma" to include:

(a) having a principal place of business, place of incorporation or ... corporate headquarters in Burma (Myanmar) or having any operations, leases, franchises, majority-owned subsidiaries, distribution agreements, or any other similar agreements in Burma (Myanmar), or being the majority-owned subsidiary, licensee or franchise of such a person;

(b) providing financial services to the government of Burma (Myanmar), including providing direct loans, underwriting government securities, providing any consulting advice or assistance, providing brokerage services, acting as a trustee or escrow agent, or otherwise acting as an agent pursuant to a contractual agreement;

(c) promoting the importation or sale of gems, timber, oil, gas or other related products, commerce in which is largely controlled by the government of Burma (Myanmar), from Burma (Myanmar);

(d) providing any goods or services to the government of Burma (Myanmar).

*Id.* § 22G.

The law allows exceptions for entities "with operations in Burma (Myanmar) for the sole purpose of reporting the news, or solely for the purpose of providing goods or services for the provision of international telecommunications." *Id.* § 22H(e). The law also exempts firms whose business in Myanmar "is providing only medical supplies." *Id.* § 22I. The law does not impose any explicit limits on the ability of private parties to engage in business in Burma, or on the ability of private parties or local governments to purchase products from firms engaged in business in Burma. It does, however, effectively force businesses to choose between doing business in Burma or with Massachusetts. Massachusetts annually purchases more than $2 billion in goods and services.

The law does not include an express statement of purpose. In introducing the law to the legislature, the bill's sponsor, Rep. Byron Rushing, stated that the law established a selective purchase program because "if you're going to engage in foreign policy, you have to be very specific." Rep. Rushing also stated that the "identifiable goal" of the law was "free democratic elections in Burma." In signing the bill, then-Lieutenant Governor Cellucci stated that "[d]ue to a steady flow of foreign investments, including those of some United States companies, [the] brutal military regime [in Burma] has been able to supply itself with weapons and portray itself as the legitimate government of Burma. Today is the day that we call their bluff." Then–Governor Weld commented that "[o]ne law passed by one state will not end the suffering and oppression of the people of Burma, but it is my hope that other states and the Congress will follow our example, and make a stand for the cause of freedom and democracy around the world."

Massachusetts argued to the district court that the law "expresses the Com-

monwealth's own disapproval of the violations of human rights committed by the Burmese government" and "contributes to the growing effort ... to apply indirect economic pressure against the Burma regime for reform." Massachusetts also argued that the law reflects "the historic concerns of the citizens of Massachusetts" with supporting the rights "of people around the world." Massachusetts does not contend that the law is designed to provide any economic benefit to Massachusetts.

At the time the National Foreign Trade Council ("NFTC") filed its complaint, there were 346 companies on the restricted purchase list. Forty-four of these companies were United States companies. The law has generated protests from a number of this country's trading partners, including Japan, the European Union, and the Association of Southeast Asian Nations ("ASEAN"). A number of companies have withdrawn from Burma in recent years; at least three cited the Massachusetts law as among the reasons for their withdrawal.

At least nineteen municipal governments have enacted analogous laws restricting purchases from companies that do business in Burma. In addition, local jurisdictions have enacted similar laws relating to China, Cuba, Nigeria, and other nations.

## 2. *Federal Sanctions Against Burma*

Congress imposed sanctions on Burma three months after Massachusetts passed the Massachusetts Burma Law. *See* Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997, § 570, 110 Stat. 3009–166 to 3009–167 (enacted by the Omnibus Consolidated Appropriations Act, 1997, Pub.L. No. 104–208, § 101(c), 110 Stat. 3009–121 to 3009–172 (1996)) ("Federal Burma Law").[3] The federal law provides for sanctions to remain in place "[u]ntil such time as the President determines and certifies to Con-

gress that Burma has made measurable and substantial progress in improving human rights practices and implementing democratic government." *Id.* § 570(a). The federal legislation is divided into five primary parts. First, the statute bars any "United States assistance to the Government of Burma," except for humanitarian assistance, assistance for anti-narcotics efforts, or "assistance promoting human rights and democratic values." *Id.* § 570(a)(1). This first part of the statute also instructs the Secretary of the Treasury to oppose any "loan or other utilization of funds" by international financial institutions and bars most Burmese officials from entering the United States unless required by treaty. *Id.* § 570(a)(2), (3).

Second, the federal law authorizes the President to impose conditional sanctions. The law states:

> The President is hereby authorized to prohibit, and shall prohibit United States persons from new investment in Burma, if the President determines and certifies to Congress that, after the date of enactment of this Act, the Government of Burma has physically harmed, rearrested for political acts, or exiled Daw Aung San Suu Kyi or has committed large-scale repression of or violence against the Democratic opposition.

*Id.* § 570(b). The law defines "new investment" to include a range of activity concerning "the economical development of resources located in Burma." *Id.* § 570(f)(2). However, "'new investment' does not include the entry into, performance of, or financing of a contract to sell or purchase goods, services, or technology." *Id.*

Third, the federal law instructs the President to work with "members of ASEAN and other countries having major trading and investment interests in Burma" to

---

**3.** We refer to the federal law as the Federal Burma Law only for the convenience of the reader.

develop "a comprehensive, multilateral strategy to bring democracy to and improve human rights practices and the quality of life in Burma, including the development of a dialogue between the State Law and Order Restoration Council (SLORC) and democratic opposition groups within Burma." *Id.* § 570(c). Fourth, the law instructs the President to report to Congress on conditions in Burma and on progress made in furthering a multilateral strategy. *See id.* § 570(d). Fifth, the law grants the President the power to waive any of the sanctions if "he determines and certifies to Congress that the application of such sanction would be contrary to the national security interests of the United States." *Id.* § 570(e).

In May 1997, President Clinton issued an Executive Order pursuant to the Federal Burma Law imposing trade sanctions on Burma. *See* Exec. Order No. 13,047, 62 Fed.Reg. 28,301 (1997); *see also* 31 C.F.R. Pt. 537 (1998) (regulations implementing sanctions authorized by the President's Executive Order). The President determined and certified that

> for purposes of section 570(b) of the [Federal Burma Law], the Government of Burma has committed large-scale repression of the democratic opposition in Burma ... [and] the actions and policies of the Government of Burma constitute an unusual and extraordinary threat to the national security and foreign policy of the United States.

62 Fed.Reg. at 28,301. The President declared "a national emergency to deal with [the] threat." *Id.* The Executive Order prohibited new investment, as defined by the Federal Burma Law, by "United States persons" and prohibited United States persons from approving or facilitating new investment in Burma by foreign persons. *Id.* Like the Federal Burma Law, the Executive Order explicitly exempts contracts "to sell or purchase goods, services, or technology," provided such transactions are not to guarantee, support, or make payments related to the development of resources in Burma. *Id.*

## 3. District Court Proceedings

The NFTC, a nonprofit corporation representing member companies that engage in foreign trade, filed suit on April 30, 1998, seeking declaratory and injunctive relief against two Massachusetts officials.[4] The NFTC contended that the Massachusetts Burma Law unconstitutionally interfered with the federal foreign relations power, violated the Foreign Commerce Clause, and was preempted by the Federal Burma Law.

Thirty-four NFTC members are on Massachusetts's most recent restricted purchase list. Three NFTC members withdrew from Burma after the passage of the Massachusetts law, citing the law as the reason for their decision to cease doing business in Burma.[5] One current NFTC member has had a bid for a procurement contract in Massachusetts increased by ten percent pursuant to the law.

The district court found that the Massachusetts Burma Law unconstitutionally infringed on the foreign affairs power of the federal government and thus granted declaratory and injunctive relief.[6] *See National Foreign Trade Council,* 26

---

**4.** The NFTC brought suit against Charles D. Baker, then Secretary of Administration and Finance of the Commonwealth of Massachusetts, and Philmore Anderson, III, the State Purchasing Agent for the Commonwealth of Massachusetts. Frederick Laskey subsequently replaced Baker as Secretary of Administration and Finance, and was Secretary at the time this appeal was taken. Andrew S. Natsios is currently the Secretary.

**5.** Two other NFTC members also severed business with Burma, citing human rights concerns as the reason for their decisions.

**6.** The district court also found that the NFTC had standing to challenge the law. *See National Foreign Trade Council,* 26 F.Supp.2d at 289–90. Massachusetts does not renew its challenge to the NFTC's standing on appeal. We have reviewed the district court's determination on the standing issue and we find that it was correct.

F.Supp.2d at 289; *National Foreign Trade Council v. Baker,* No. 98–10757 (D.Mass. Nov. 17, 1998) (order granting relief). The court also found that the NFTC had not met its burden of showing that the Federal Burma Law preempted the Massachusetts Burma Law. The district court did not consider the NFTC's argument that the Massachusetts law also violates the Foreign Commerce Clause. *See id.* at 293.

### 4. *Standard of Review*

■ The district court ruled on cross-motions for summary judgment, on stipulated facts and uncontested affidavits. The decision turned entirely on questions of law. This court thus reviews the district court's determinations de novo. *See Philip Morris Inc. v. Harshbarger,* 122 F.3d 58, 61–62 (1st Cir.1997).

## II

### 1. *The Foreign Affairs Power of the Federal Government*

We begin with a review of the Constitution's grant of power over foreign affairs to the political branches of the federal government. The Constitution grants Congress the power "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, "[t]o regulate Commerce with foreign Nations," *id.* cl. 3, "[t]o establish an uniform Rule of Naturalization," *id.* cl. 4, "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations," *id.* cl. 10, and "[t]o declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water," *id.* cl. 11. In addition, "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." *Id.* § 9, cl. 8. Finally, "[t]he Congress shall have

Power to declare the Punishment of Treason." *Id.* art. III, § 3, cl. 2.

The Constitution declares that the President shall be Commander in Chief, *id.* art. II, § 2, cl. 1, and, with the advice and consent of the Senate, grants him the power "to make Treaties" and to "appoint Ambassadors," *id.* cl. 2. Additionally, the President "shall receive Ambassadors and other public Ministers." *Id.* § 3.

The states are forbidden to "enter into any Treaty, Alliance, or Confederation" or to "grant Letters of Marque and Reprisal," *id.* art. I, § 10, cl. 1, may not "without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing [their] inspection Laws," *id.* cl. 2, and may not, "without the Consent of Congress . . . enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay," *id.* cl. 3.

■ The Constitution's foreign affairs provisions have been long understood to stand for the principle that power over foreign affairs is vested exclusively in the federal government. James Madison commented that "[i]f we are to be one nation in any respect, it clearly ought to be in respect to other nations." *The Federalist* No. 42, at 302 (James Madison) (B.F. Wright ed., Barnes & Noble Books 1996); *see also id.* at 303 (noting that the Articles of Confederation, by failing to contain any "provision for the case of offences against the law of nations," left "it in the power of any indiscreet member to embroil the Confederacy with foreign nations"). Alexander Hamilton, discussing state regulation of foreign commerce, noted that

> [t]he interfering and unneighborly regulations of some States, contrary to the true spirit of the Union, have, in different instances, given just cause of umbrage and complaint to others, and it is to be feared that examples of this nature, if not restrained by a national control, would be multiplied and extended

till they became not less serious sources of animosity and discord than injurious impediments to the intercourse between the different parts of the Confederacy. *Id.* No. 22, at 192 (Alexander Hamilton); *see also id.* No. 45, at 328 (James Madison) (stating that "[t]he powers delegated by the proposed Constitution to the federal government are few and defined," and "will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce").[7] Justice Taney echoed Madison's and Hamilton's views in *Holmes v. Jennison,* 39 U.S. (14 Pet.) 540, 10 L.Ed. 579 (1840), commenting that "[i]t was one of the main objects of the Constitution to make us, so far as regarded our foreign relations, one people, and one nation." *Id.,* 39 U.S. (14 Pet.) at 575 (opinion of Taney, J.).

■ Indeed, the Supreme Court has long held that "[p]ower over external affairs is not shared by the States; it is vested in the national government exclusively." *United States v. Pink,* 315 U.S. 203, 233, 62 S.Ct. 552, 86 L.Ed. 796 (1942). In *The Chinese Exclusion Case,* for example, the Court commented that "[f]or local interests the several States of the Union exist, but for national purposes, embracing our relations with foreign nationals, we are but one people, one nation, one power." *Chae Chan Ping v. United States,* 130 U.S. 581, 606, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). In *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941), the Court stated that "[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Id.* at 63, 61 S.Ct. 399; *see also United States v. Belmont,* 301 U.S. 324, 331, 57 S.Ct. 758, 81 L.Ed. 1134 (1937) ("[I]n respect of our foreign relations generally,

state lines disappear."). As the Court explained in *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), when it comes to foreign affairs, the powers of the federal government are not limited: "[t]he broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true *only in respect of our internal affairs.*" *Id.* at 315–16, 57 S.Ct. 216 (emphasis added).

■ Federal dominion over foreign affairs does not mean that there is no role for the states. A limited role is granted by the Constitution, as discussed earlier. *See* Restatement (Third) of Foreign Relations Law of the United States § 201 reporters' note 9 (commenting that "[u]nder the United States Constitution, a State of the United States may make compacts or agreements with a foreign power with the consent of Congress (Article I, Section 10, clause 2), but such agreements are limited in scope and subject matter" and that "[a] State may make some agreements with foreign governments without the consent of Congress so long as they do not impinge upon the authority or the foreign relations of the United States"). Indeed, Massachusetts itself maintains twenty-three "sister state" and other bilateral agreements with sub-national foreign governments and trade promotion organizations. As one learned commentator explains, some degree of state involvement in foreign affairs is inevitable: "[i]n the governance of their affairs, states have variously and inevitably impinged on U.S. foreign relations." L. Henkin, *Foreign Affairs and the United States Constitution* 162 (2d ed.1996).

The central question is whether the state law runs afoul of the federal foreign affairs power as interpreted by the Supreme Court in *Zschernig v. Miller,* 389

---

**7.** As the Supreme Court has indicated, *The Federalist* is "usually regarded as indicative of the original understanding of the Constitu-

tion." *Printz v. United States,* 521 U.S. 898, 909, 117 S.Ct. 2365, 2372, 138 L.Ed.2d 914 (1997).

U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968), the case in which the Supreme Court has most directly considered the boundaries of permissible state activity in the foreign affairs context.

## 2. The Decision in Zschernig

In *Zschernig*, the Supreme Court invalidated an Oregon statute that barred a non-resident alien from taking property by testamentary disposition or succession unless he showed the existence of three conditions: 1) "the existence of a reciprocal right of a United States citizen to take property on the same terms as a citizen or inhabitant of the [alien's] foreign country"; 2) the right of United States citizens to "receive payment here of funds from estates in the foreign country"; and 3) "the right of the foreign heirs to receive the proceeds of Oregon estates 'without confiscation.'" *Id.* at 430–31, 88 S.Ct. 664 (quoting Ore.Rev.Stat. § 111.070 (1957)). If these requirements were not fulfilled and there were no other heirs, the Oregon property would escheat to the state. In *Zschernig*, the sole heirs to the estate of an Oregon resident who had died intestate in 1962 were residents of East Germany, and thus Oregon's State Land Board had petitioned for the escheat of the proceeds of the estate. *See id.* at 430, 88 S.Ct. 664. The Court held that the statute was "an intrusion by [Oregon] into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Id.* at 432, 88 S.Ct. 664.

The *Zschernig* Court distinguished the law at issue from a similar California statute previously upheld in *Clark v. Allen*, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947). The California statute was upheld against a facial challenge. In contrast, the challenge to the Oregon statute involved "the manner of its application." *Zschernig*, 389 U.S. at 433, 88 S.Ct. 664. The Supreme Court stated in *Zschernig* that "[h]ad [*Clark*] appeared in the posture of the present [case], a different result would have obtained." *Id.* As the Court ex-

plained, the problem with the Oregon law was not that it required courts to inquire into foreign law—for "[s]tate courts, of course, must frequently read, construe, and apply laws of foreign nations," *id.*, but was rather that probate courts had used the reciprocity requirement to "launch[ ] inquiries into the type of governments that obtain in particular foreign nations," *id.* at 434, 88 S.Ct. 664. The Oregon statute had "led into minute inquiries concerning the actual administration of foreign law, into the credibility of foreign diplomatic statements, and into speculation whether the fact that some received ·delivery of funds should not preclude wonderment as to how many may have been denied the right to receive." *Id.* at 435, 88 S.Ct. 664 (internal quotation marks omitted). Such evaluations. "affect[ ] international relations in a persistent and subtle way," the Court found, and thus "may well adversely affect the power of the central government to deal with" problems of international relations. *Id.* at 440–41, 88 S.Ct. 664.

The district court found the Massachusetts Burma Law invalid under *Zschernig*. The court interpreted *Zschernig* to stand for the proposition that "states and municipalities must yield to the federal government when their actions affect significant issues of foreign policy." *National Foreign Trade Council*, 26 F.Supp.2d at 291. The court stated that because the Massachusetts law "has more than an 'indirect or incidental effect in foreign countries,'" and has a "'great potential for disruption or embarrassment,'" it unconstitutionally infringes on the federal government's foreign affairs power. *Id.* (quoting *Zschernig*, 389 U.S. at 434–35, 88 S.Ct. 664). The district court noted that the law was enacted solely to sanction Burma so as to pressure the Burmese government to change its domestic policies, and that the views of the European Union and ASEAN demonstrated that the law was having a "disruptive impact on foreign relations." *Id.*

■ The precise boundaries of the Supreme Court's holding in *Zschernig* are

unclear.[8] Nonetheless, we agree with the district court that the Massachusetts Burma Law is unconstitutional under *Zschernig*. Because the parties' arguments raise issues of first impression, we consider these arguments in detail.

Massachusetts's arguments that the district court erred can be divided into two lines of attack. First, Massachusetts attempts to distinguish the facts in *Zschernig* from the facts of this case, and to argue that the *Zschernig* Court recognized the need to balance state interests against possible harm resulting from state intrusion in foreign affairs. This balance, says Massachusetts, weighs in favor of the Massachusetts law being found constitutional. Second, Massachusetts in effect argues that *Zschernig* is weak precedent. In particular, Massachusetts contends that the Supreme Court's decision in *Barclays Bank PLC v. Franchise Tax Board*, 512 U.S. 298, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994), demonstrates that the Supreme Court's holding in *Zschernig* is limited. The NFTC, in turn, contends that the Massachusetts Burma Law constitutes far greater interference in foreign affairs than did the law under attack in *Zschernig*, and argues that Massachusetts is in effect asking this court to overrule *Zschernig*.

First, Massachusetts attempts to distinguish *Zschernig* by arguing that the Court struck down the Oregon law as applied, and did not question the ability of states to enact laws that indirectly affect foreign affairs. Massachusetts argues that its law does not entail nearly the degree of ongoing scrutiny or criticism of foreign government action by the state that the Oregon law entailed. Massachusetts contends that *Zschernig* left intact the holding in *Clark*, although the law there was also designed to influence the behavior of foreign countries. Indeed, *Clark* expressly stated that the fact that a state law has "incidental or indirect effect in foreign countries" does not make the law invalid. *Clark*, 331 U.S. at 517, 67 S.Ct. 1431. According to Massachusetts, the district court incorrectly read *Zschernig* to stand for the proposition that a state law that goes beyond an incidental or indirect effect on foreign affairs is impermissible, and *Zschernig* instead stands for the proposition that courts must weigh the degree of impact against the particular state interest at issue.

Massachusetts further argues that its law is concerned with expressing its moral views regarding conditions in Burma, that its desire to disassociate Massachusetts from Burma's human rights violations is a valid purpose of the law, and that Massachusetts would have enacted the law regardless of whether it believed that the law would result in change in Burma.

■ Massachusetts's arguments fail under *Zschernig*. The Massachusetts Burma Law clearly has more than an "incidental or indirect effect in foreign countries." We do not read *Zschernig* as instructing courts to balance the nation's interests in a unified foreign policy against the particular interests of an individual state. Instead, *Zschernig* stands for the principle that there is a threshold level of involvement in and impact on foreign affairs which the states may not exceed. As *Zschernig* stated:

> The several States, of course, have traditionally regulated the descent and distribution of estates. But *those regulations must give way if they impair the effective exercise of the Nation's foreign policy.* Where those laws conflict with a

---

8. As Professor Henkin comments:

It may prove that *Zschernig v. Miller* excludes only state actions that reflect a state policy critical of foreign governments and involve "sitting in judgment" on them. Even if so limited, the doctrine might cast doubts on the right of the states to apply their own "public policy" in transnational situations. Or was the Court suggesting different lines—between state acts that impinge on foreign relations only "indirectly or incidentally" and those that do so directly or purposefully? Between those that "intrude" on the conduct of foreign relations and those that merely "affect" them?

Henkin, *supra*, at 164 (footnotes omitted).

treaty, they must bow to the superior federal policy. Yet, even in absence of a treaty, a State's policy may disturb foreign relations.

*Id.* at 440–41, 88 S.Ct. 664 (emphasis added) (citations omitted). *Zschernig* did not hold, as Massachusetts argues, that a sufficiently strong · state interest could make lawful an otherwise impermissible intrusion into the federal government's foreign affairs power.

█ Massachusetts makes another preliminary argument which we reject. It attempts to distinguish the instant case from *Zschernig* based on the level and frequency of scrutiny that the Massachusetts law entails. This argument is largely beside the point. Further, the argument fails even on its own terms. It is beside the point because the effect of the law is not measured solely by the level or frequency of scrutiny. Every decision by a company to withdraw from or not seek new business in Burma has an ongoing impact every bit as corrosive as scrutiny. Massachusetts correctly notes that its courts are not engaging in ongoing evaluations of the situation in Burma; nor does the law permit or encourage such inquiries. Yet while the statute itself creates no mechanism for the Massachusetts courts or legislature to evaluate conditions in Burma on an ongoing basis, the law quite clearly establishes ongoing scrutiny. The Massachusetts law creates a mechanism for ongoing investigation into whether companies are doing business with Burma: every time a firm bids for a Massachusetts procurement contract, Massachusetts inquires into whether that firm does business in Burma. The scrutiny involved here is not of human rights conditions alone. By investigating whether certain companies are doing business with Burma, Massachusetts is evaluating developments abroad in a manner akin to the Oregon probate courts in *Zschernig*.

█ The conclusion that the Massachusetts law has more than an incidental or indirect effect on foreign relations is dictated by the combination of factors present here: (1) the design and intent of the law is to affect the affairs of a foreign country; (2) Massachusetts, with its $2 billion in total annual purchasing power by scores of state authorities and agencies, is in a position to effectuate that design and intent and has had an effect; (3) the effects of the law may well be magnified should Massachusetts prove to be a bellwether for other states (and other governments); (4) the law has resulted in serious protests from other countries, ASEAN, and the European Union; and (5) Massachusetts has chosen a course divergent in at least five ways from the federal law, thus raising the prospect of embarrassment for the country.

Our discussion of the facts demonstrates the first two of these factors; the fifth factor is discussed in our preemption analysis later in this opinion. We turn to the third and fourth factors. ·

█ The threat to federal foreign affairs power is magnified when Massachusetts is viewed as part of a broader pattern of state and local intrusion. Under *Zschernig*, the effect of state and local laws should not be considered in isolation; rather, courts must consider the combined effects of similar laws in numerous jurisdictions. In determining whether the Oregon law was likely to have a significant effect on the nation's foreign affairs, the Supreme Court noted that "[i]t now appears that in this reciprocity area under inheritance statutes, the probate courts of various States have launched inquiries into the type of governments that obtain in particular foreign nations." *Id.* at 433–34, 88 S.Ct. 664. Massachusetts is not alone in its views regarding Burma and there is great potential for the proliferation of similar statutes. Many municipalities have passed laws akin to the Massachusetts Burma Law, whether targeting Burma or some other country with disfavored policies, and amici inform us that other states and large cities are waiting in the wings.

This country has, we are told, 39,000 governments at levels other than the federal government, some twenty of which have participated in the briefs amici curiae here.

■■■ We also consider the protests received from this country's allies and trading partners. A European Union official stated that the Massachusetts Burma Law is "an attack on international law." An ASEAN official commented that ASEAN is "dismayed by this trend [of sub-national laws targeting Burma], because you cannot negotiate with states and provinces." We reject Massachusetts's claim that we should ignore the fact that foreign nations have objected to the Massachusetts Burma Law.[9] In *Zschernig*, the Supreme Court expressly cited Bulgaria's objections to the Oregon law as evidence of the fact that the law was affecting foreign relations. *See id.* at 436–37, 437 n. 7, 88 S.Ct. 664. The *Zschernig* Court also noted the "great potential for disruption or embarrassment" caused by the Oregon law. *Id.* at 435, 88 S.Ct. 664. The protests of America's trading partners are evidence of the great potential for disruption or embarrassment caused by the Massachusetts law.

Massachusetts points to two sources to support its claim that, when examining whether a state or local law intrudes on the federal government's foreign affairs power, United States courts should simply ignore foreign government objections. First, Massachusetts notes that the federal law implementing the Uruguay Round of the General Agreement on Tariffs and Trade (GATT) denies foreign governments and private persons the right to challenge state laws based on the GATT. *See* Uruguay Round Agreements Act, Pub.L. No. 103–465. § 102, 108 Stat. 4809, 4815–19 (1994) (codified at 19 U.S.C. § 3512 (West Supp.1999)). Massachusetts contends that, given this provision, objections from foreign states to the Massachusetts law should not be considered.[10] This argument is inapposite: this action has not been brought pursuant to the GATT or any World Trade Organization agreement, and the NFTC does not argue that the law should be invalidated because of a conflict with any international trade agreement or treaty.

■■■ Second, Massachusetts claims that *Barclays* rejected reliance on the views of our trading partners. We disagree with Massachusetts's interpretation of *Barclays*. Setting aside our view, discussed further below, that *Barclays* does not ap-

---

**9.** Massachusetts similarly argues that the district court erred in looking to State Department comments regarding the Massachusetts law. As Massachusetts contends, the Supreme Court has at times discounted federal Executive Branch positions. *See Zschernig*, 389 U.S. at 434–35, 88 S.Ct. 664; *see also Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 195–96, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (stating that an Executive Branch decision not to file an amicus brief opposed to the state tax in question was "by no means dispositive," but that "when combined with all the other considerations we have discussed, it does suggest that the foreign policy of the United States ... is not seriously threatened" by the state law in question). Indeed, in *Barclays*, the Supreme Court expressly considered the force of "Executive Branch actions—press releases, letters, and amicus briefs," stating that "Executive Branch communications that express federal policy but lack the force of law cannot render unconstitutional California's oth-

erwise valid, congressionally condoned, use of worldwide combined reporting." *Barclays*, 512 U.S. at 329–30, 114 S.Ct. 2268. Massachusetts is correct that Executive Branch views are not dispositive. In this case, however, this court's own inquiry leads to the conclusion that the law impermissibly interferes with the federal government's foreign affairs power.

While there have been conflicting Executive Branch statements regarding the effect of the Massachusetts Burma Law and similar laws, the Executive Branch has not taken an official position in this litigation.

**10.** The NFTC asserts that this argument was not raised below, and that there is nothing in the Agreements Act suggesting that it forecloses constitutional remedies. The NFTC misinterprets Massachusetts's argument, which is that the court should not look to foreign government views of the state law (not that constitutional challenges are per se barred).

ply outside the context of Commerce Clause challenges to laws that do not target specific foreign nations or foreign commerce, *Barclays* does not stand for the proposition that courts should ignore foreign government objections. While the Supreme Court in *Barclays* found foreign government views to be unpersuasive, it did not ignore such views. *See Barclays*, 512 U.S. at 324 n. 22, 327–28, 114 S.Ct. 2268. The message of *Barclays* is thus consistent with *Zschernig*: foreign government views, although not dispositive, are *one factor* to consider in determining whether a law impermissibly interferes with the federal government's foreign affairs power.

The preemption analysis later in this opinion outlines the inconsistencies and conflicts between the Massachusetts Burma Law and the Federal Burma Law. The point for *Zschernig* purposes is distinct. The Massachusetts law presents a threat of embarrassment to the country's conduct of foreign relations regarding Burma, and in particular to the strategy that the Congress and the President have chosen to exercise. That significant potential for embarrassment, together with the other factors listed above, drives the conclusion that the Massachusetts Burma Law has more than an "incidental or indirect effect" and so is an impermissible intrusion into the foreign affairs power of the national government.

3. *Applications of Zschernig*

Our approach to this case is largely consistent with that taken by the few other courts that have considered challenges to state and local laws brought under *Zschernig*. These cases have generally fallen into two categories: challenges to the application of laws targeting specific foreign states, most often South Africa, and challenges to state "buy-American" laws.

In *New York Times Co. v. City of New York Commission on Human Rights*, 41 N.Y.2d 345, 393 N.Y.S.2d 312, 361 N.E.2d 963 (1977), the court found that New York could not apply local anti-discrimination laws to prohibit the *New York Times* from carrying an advertisement for employment opportunities in South Africa. Under *Zschernig*, the court said that "[e]ven longstanding state regulation of traditional fields of law ... must fall by the wayside if enforcement of State regulations would 'impair the effective exercise of the Nation's foreign policy.'" *Id.* at 968 (quoting *Zschernig*, 389 U.S. at 440, 88 S.Ct. 664). Similarly, in *Springfield Rare Coin Galleries, Inc. v. Johnson*, 115 Ill.2d 221, 104 Ill.Dec. 743, 503 N.E.2d 300 (1986), the Illinois Supreme Court invalidated a state statute that had excluded South African coins from state tax exemptions applying to coins and currency issued by all other nations. The court found that the "sole motivation [for the law] was disapproval of a nation's policies" and that the legislation effectively "impose[d], or at least encourage[d], an economic boycott of the South African Krugerrand," and thus was "outside the realm of permissible state activity." *Id.* at 307; *see also Tayyari v. New Mexico State Univ.*, 495 F.Supp. 1365, 1376–80 (D.N.M.1980) (finding that a state university's decision to bar admission or readmission of Iranian students could affect international relations and thus was impermissible).

In contrast, in *Board of Trustees of the Employees' Retirement System of Baltimore v. Mayor and City Council of Baltimore*, 317 Md. 72, 562 A.2d 720 (1989), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990), the Maryland Court of Appeals found that Baltimore ordinances requiring city pension funds to divest their holdings from companies engaged in business in South Africa were not unconstitutional under *Zschernig*. The court thought *Zschernig* "circumscribes, but apparently does not eliminate, a state's ability under certain circumstances to take actions involving substantive judgments about foreign nations." *Id.* at 746. Massachusetts relies heavily on the decision in *Board of Trustees*, attempting to distin-

guish between Baltimore's decisions regarding how to invest the city's funds and the laws struck down in *New York Times Co.* and *Springfield Rare Coin Galleries, Inc.*, which were designed to regulate private conduct. The district court correctly distinguished *Board of Trustees* as involving quite different facts, *see National Foreign Trade Council*, 26 F.Supp.2d at 291–92, and the NFTC urges this court to do the same. *Board of Trustees*, whether rightly or wrongly decided, does not alter our decision that the Massachusetts Burma Law, by targeting a foreign country, monitoring investment in that country, and attempting to limit private interactions with that country, goes far beyond the limits of permissible regulation under *Zschernig*.[11]

Courts have also split on whether state buy-American statutes are unconstitutional under *Zschernig*. In *Bethlehem Steel Corp. v. Board of Commissioners*, 276 Cal. App.2d 221, 80 Cal.Rptr. 800 (1969), the court invalidated the California Buy American Act as "an unconstitutional encroachment upon the federal government's exclusive power over foreign affairs," *id.* at 802, and noted that the fact that "there are countervailing state policies which are served by the retention of such an Act is 'wholly irrelevant,'" *id.* at 803 (quoting *Pink*, 315 U.S. at 233, 62 S.Ct. 552). In contrast, in *Trojan Technologies, Inc. v. Pennsylvania*, 916 F.2d 903 (3d Cir.1990), *cert. denied*, 501 U.S. 1212, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991), and *K.S.B. Technical Sales Corp. v. North Jersey District Water Supply Commission*, 75 N.J. 272, 381 A.2d 774 (1977), courts upheld buy-American statutes at least in part because such statutes did not require state governments to evaluate the policies of foreign nations, and because the laws treated all foreign states in the same fashion. *See Trojan Technologies*, 916 F.2d at 913–914; *K.S.B. Technical Sales Corp.*, 381 A.2d at 782–84. Thus, in *Trojan Technologies*, the

Third Circuit upheld a Pennsylvania buy-American statute because the law "provides no opportunity for state administrative officials or judges to comment on, let alone key their decisions to, the nature of foreign regimes" and because there was no "indication from the record that the statute [had] been selectively applied according to the foreign policy attitudes of Commonwealth courts or the Commonwealth's Attorney General." *Trojan Technologies*, 916 F.2d at 913.

As the district court correctly noted, *see National Foreign Trade Council*, 26 F.Supp.2d at 292, *K.S.B. Technical Sales Corp.* and *Trojan Technologies* both involved laws that did not single out or evaluate any particular foreign state, and did not involve state evaluations of political conditions abroad. In contrast, the Massachusetts Burma Law is aimed at a specific foreign state and has more than incidental effects.

### 4. Subsequent Supreme Court Decisions and Zschernig

Massachusetts's second line of attack against the district court's ruling is that Supreme Court decisions subsequent to *Zschernig*, in particular the *Barclays* decision, demonstrate that *Zschernig* is so limited as not to invalidate the statute. Massachusetts relies on both the language of *Barclays* and on the views of some academic commentators to argue that *Zschernig* is or should be treated as a highly limited holding.

### a. Subsequent Supreme Court References to Zschernig

*Zschernig* remains "[t]he only case in which the Supreme Court has struck down a state statute as violative of the foreign affairs power" of the federal government. *International Ass'n of Independent Tanker Owners v. Locke*, 148 F.3d 1053, 1069

---

**11.** Massachusetts may well have tried to insulate itself from attack under *Zschernig* by creating a mechanism that scrutinizes companies doing business in Burma rather than the Burmese government itself, but such scrutiny is similarly intrusive.

(9th Cir.1998), *petition for cert. filed*, 67 U.S.L.W. 3671 (U.S. Apr. 23, 1999) (No. 98–1706). Subsequent Supreme Court decisions have done little to clarify the reach of the Court's holding in *Zschernig*. Most often the Court has cited the case for the proposition that the federal government's powers over foreign affairs are plenary, or for the proposition that cases in United States courts that involve foreign sovereigns raise sensitive issues of foreign affairs. *See, e.g., Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 719, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) ("Actions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States, and the primacy of federal concerns is evident."); *see also Dennis v. Higgins*, 498 U.S. 439, 463, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991) (Kennedy, J., dissenting). In *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), involving the application of the act of state doctrine, the plurality distinguished *Zschernig* by noting that in *Zschernig* "the Court struck down an Oregon statute that was held to be 'an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress.'" *Id.* at 765, 92 S.Ct. 1808 (plurality opinion of Rehnquist, J.) (quoting *Zschernig*, 389 U.S. at 432, 88 S.Ct. 664). No decision by the Court citing *Zschernig* suggests that it is not binding.

### b. *The Effect of Barclays*

Massachusetts argues that this court should nonetheless look to *Barclays*. *Barclays*, however, did not consider the reach of the foreign affairs power and did not cite *Zschernig*. *See Barclays*, 512 U.S. at 301–31, 114 S.Ct. 2268.

In *Barclays*, the Court upheld California's corporate tax system against Commerce Clause and due process challenges to its worldwide combined reporting requirement. Petitioner Barclays had argued that the system burdened foreign-based multinationals; Barclays had also argued that the law impeded the federal government's ability to "speak with one voice when regulating commercial relations with foreign governments." *Id.* at 302–03, 114 S.Ct. 2268 (quoting *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 449, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979)) (internal quotation marks omitted).

The *Barclays* Court reaffirmed that, in addition to the ordinary domestic commerce clause analysis set forth in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), state regulation of foreign commerce raises two additional concerns: first, an "enhanced risk of multiple taxation," *Barclays*, 512 U.S. at 311, 114 S.Ct. 2268 (quoting *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 185, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983)) (internal quotation marks omitted), and second, the risk of harm to the "Federal Government's capacity to speak with one voice when regulating commercial relations with foreign governments," *id.* (quoting *Japan Line*, 441 U.S. at 449, 99 S.Ct. 1813) (internal quotation marks omitted). In the absence of a congressional or presidential assertion that the challenged California law violated federal policy, however, the Court could not "conclude that 'the foreign policy of the United States—whose nuances ... are much more the province of the Executive Branch and Congress than of this Court—is [so] seriously threatened' by California's practice as to warrant our intervention." *Barclays*, 512 U.S. at 327, 114 S.Ct. 2268 (alteration in original) (citation omitted) (quoting *Container Corp.*, 463 U.S. at 196, 103 S.Ct. 2933).

*Barclays* also reaffirmed that recognition of the importance of the federal government's ability to speak with one voice on foreign affairs does not mean that Congress must act, or that the states can never act, in a particular area. *See id.* at

329, 114 S.Ct. 2268. As the Court commented in *Wardair Canada Inc. v. Florida Department of Revenue*, 477 U.S. 1, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986), where it similarly found that a state tax law did not impede the ability of the federal government to speak with one voice,

> [b]y negative implication . . . the United States has at least acquiesced in state taxation of fuel used by foreign carriers in international travel. . . . [T]he Federal Government is entitled in its wisdom to act to permit the States varying degrees of regulatory authority.

> . . . . .

> [W]e never suggested in [*Japan Line*] or in any other [case] that the Foreign Commerce Clause *insists* that the Fed-

eral Government speak with any particular voice.

*Id.* at 12–13, 106 S.Ct. 2369 (emphasis in original).

■ Massachusetts contends that *Barclays* means that only Congress, not the courts, should ever determine whether a state law interferes with the foreign affairs power of the federal government.[12] This argument echoes academic debate over whether *Barclays* undercuts *Zschernig* or not.[13]

■ Scholarly debate about the continuing viability of a Supreme Court opinion does not, of course, excuse the lower federal courts from applying that opinion. We need not delve into the merits of the academic debate [14] over *Barclays* in order

**12.** Massachusetts also contends that *Barclays* demonstrates that Congress has, via inaction, explicitly permitted the Massachusetts Burma Law. We return to this argument below.

**13.** One commentator, for example, contends that *Barclays* stands for the proposition that *courts* should not weigh the effects of a state law on foreign relations, that *Barclays* undercuts claims that Massachusetts is interfering with the federal government's ability to speak with one voice, and that *Barclays* indicates that the Court will presume congressional tolerance of laws that touch on foreign affairs issues, in particular if foreign governments object to the state law in question. *See* Jack L. Goldsmith, *Federal Courts, Foreign Affairs, and Federalism*, 83 Va. L.Rev. 1617, 1700–01 (1997).

Professor Koh contests Professor Goldsmith's interpretation, arguing that it would be a mistake to read too much into the Court's statements in *Barclays*. Koh notes that the Solicitor General backed California's argument that there was no conflict between the state's tax laws and federal policy. "Thus, the case reveals less about the Supreme Court's view of federalism than about the Court's traditional judicial deference to the executive branch in foreign affairs." Harold Hongju Koh, *Is International Law Really State Law?*, 111 Harv. L.Rev. 1824, 1848 (1998).

**14.** Other academic commentary has also questioned *Zschernig*. We describe the commentary but also note that an alternative view is also quite rational: that in an increasingly interdependent and multilateral world,

*Zschernig*'s affirmation of the foreign affairs power of the national government may be all the more significant.

Professor Henkin notes that *Zschernig* marked a significant break from prior Supreme Court jurisprudence. When the Supreme Court imposed limits on state regulation or taxation of foreign commerce prior to *Zschernig*, such limits "were found to be implied in the Commerce Clause." Henkin, *supra*, at 162. *Zschernig*, in contrast, used the dormant foreign affairs power of the federal government. Thus, prior to *Zschernig*, "[t]he Court never asked whether such state actions might run afoul also of some larger principle limiting the states in matters that relate to foreign affairs." *Id.* Hence *Zschernig* "was new constitutional doctrine," because "there was no relevant exercise of federal power and no basis for deriving any prohibition for the states by 'interpretation' of the silence of Congress and the President. The Court told us that the Constitution itself excludes such state intrusions even when the federal branches have not acted." *Id.* at 163–64 (footnote omitted).

Professor Goldsmith makes a related argument in commenting on *Zschernig* and *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). In *Sabbatino*, the Court found that the act of state doctrine precluded a challenge to an expropriation decree of the Cuban government. *See id.* at 428, 84 S.Ct. 923. Goldsmith contends that both *Sabbatino* and *Zschernig* marked significant breaks in the Supreme Court's development of the common law of foreign relations. Although the Court

to resolve this case. We do not view *Barclays* as having the impact in the foreign affairs power analysis that Massachusetts contends it has, for at least two reasons. First, *Barclays* did not involve a state law that targeted any foreign nation or nations, and there was no claim in the case that California was engaging in foreign policy via its tax system; the case involved claims only that the California law violated the Commerce and Due Process clauses. *See Barclays*, 512 U.S. at 302–03, 114 S.Ct. 2268. The Court's discussion of congressional inaction came only in the context of an examination of the "speak with one voice" prong of the Foreign Commerce Clause analysis, a prong that the court reached only after concluding that the law was not otherwise unconstitutional. *See id.* at 320–30, 114 S.Ct. 2268. In contrast, the present case involves a law impacting one foreign nation, and a claim that the Massachusetts law violates the foreign affairs power of the federal government. Second, the Supreme Court did not cite to *Zschernig* in *Barclays*, thus keeping separate the analyses that apply when examining laws under the Foreign Commerce Clause and under the foreign affairs power.[15] This is particularly so given that the parties in *Barclays* cited *Zschernig* to the Court in their briefs and at oral argument. In sum, there is simply no indication, in *Barclays* or in any other post-*Zschernig* case, that *Zschernig* is not good law and is not binding on us. As this court explained in *Figueroa v. Rivera*, 147 F.3d 77 (1st Cir.1998), the Supreme Court "has admonished the lower federal courts to follow its

directly applicable precedent, even if that precedent appears weakened by pronouncements in its subsequent decisions, and to leave to the Court 'the prerogative of overruling its own decisions.'" *Id.* at 81 n. 3 (quoting *Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)).

5. *Additional Arguments Regarding the Foreign Affairs Power*

a. *There is No Market Participant Exception to the Foreign Affairs Power*

Massachusetts suggests that, even if its interpretation of *Barclays* and *Zschernig* is incorrect, the Massachusetts Burma Law can be upheld by applying a market participant exception. This is a novel argument. Massachusetts contends that the market participant exception to the dormant domestic Commerce Clause should be extended both to the Foreign Commerce Clause—an extension that the Supreme Court has never made—and from there to the foreign affairs power. Even assuming that Massachusetts is acting as a market participant (and not exercising its police or regulatory powers) and that the market participant exception applies to the Foreign Commerce Clause, we find no support for Massachusetts's contention that the exception should shield its law from challenges brought under the federal foreign affairs power as interpreted in *Zschernig*.

Massachusetts provides little support for its argument, citing no case which has ever accepted it.[16] Massachusetts contends

---

had repeatedly found federal exclusivity in foreign relations prior to *Sabbatino*, it had generally done so "by virtue of either (a) the political branches' occupation of the field through treaty and statute, or (b) independent constitutional prohibitions." Goldsmith, *supra*, at 1649–50. Enforcement of federal exclusivity in foreign relations via "a judicially enforced dormant preemption" was a new development. *See id.* at 1649.

15. We consider below the impact of *Barclays* on the NFTC's Commerce Clause and Supremacy Clause challenges.

16. Massachusetts claims that the court in *Trojan Technologies, Inc. v. Pennsylvania*, 742 F.Supp. 900 (M.D.Pa.1990), *aff'd*, 916 F.2d 903 (3d Cir.1990), applied a market participant exception to the foreign affairs power. *See id.* at 903. There, the district court applied a market participant exception to the Foreign Commerce Clause. *See id.* at 902–03. In discussing the foreign affairs power, the court found that "the only impact of the Act on other countries is incidental—i.e., a possible decrease in the total sales of foreign steel in Pennsylvania because public agencies will not buy it." *Id.* at 903. The court traced

that in *The Federalist* the Framers were concerned with state regulatory action that infringed on foreign affairs, not state proprietary action. The same rationales that support the market participant exception in dormant domestic Commerce Clause jurisprudence, Massachusetts insists, support extension of the exception to claims under the foreign affairs power.

■■■ Massachusetts also relies on a 1986 Department of Justice advisory opinion concerning the constitutionality of state and local statutes regarding divestment from South Africa. *See* 10 Op. Off. Legal Counsel 49 (1986). The opinion argues that "[t]he historical rationale for the general federal power over foreign affairs does not imply the displacement of state proprietary power," and that "[b]ecause states ... possessed proprietary powers at the time of the Constitution, these powers should not be displaced unless they are prohibited by a specific limitation imposed by the Constitution or federal legislation passed pursuant to a constitutional grant of power to the federal government." *Id.* at 63–64. This view directly contradicts the Supreme Court's repeated statements that the federal government's foreign affairs power is not limited. *Zschernig* makes clear that, by necessary implication, the federal government's foreign affairs power exceeds the power expressly granted in the text of the Constitution, and that state action, even in traditional areas of

state concern, must yield to the federal power when such state action has more than an indirect effect on the nation's own foreign policy. Nothing in *Zschernig* or in the Supreme Court's market participant caselaw supports Massachusetts's argument. The Supreme Court has already rejected one attempt to extend the market participation doctrine to constitutional provisions other than the domestic Commerce Clause. *See United Bldg. & Const. Trades Council v. Mayor & Council of Camden,* 465 U.S. 208, 219–20, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) (stating that the "distinction between market participant and market regulator relied upon in [domestic Commerce Clause caselaw] to dispose of the Commerce Clause challenge is not dispositive" of a claim brought under the Privileges and Immunities Clause, because "[t]he two Clauses have different aims and set different standards for state conduct").

b. *The Tenth Amendment Does Not Insulate the Massachusetts Burma Law from Constitutional Scrutiny*

■■■ Massachusetts also suggests in passing that its law should be protected by the Tenth Amendment, or that the Tenth Amendment, at the least, indicates that strong state interests are at stake here. To the extent that Massachusetts intended to assert a direct Tenth Amendment claim, that claim is waived.[17] It would not suffice

---

"[t]his result ... to participation in the market place and not to any effort to control or regulate commerce with foreign countries." *Id.*

The *Trojan Technologies* opinion does not clarify which of three factors—incidental impact, participation in the marketplace, or lack of effort to control commerce with foreign countries—persuaded the district court to uphold the Pennsylvania law. In affirming the Third Circuit avoided the subject entirely, grounding its discussion of the foreign affairs power on examination of, and interference with, the internal workings of foreign nations. *See Trojan Technologies,* 916 F.2d at 913–14. At best, the district court decision in *Trojan Technologies* provides Massachusetts with a highly ambiguous holding that was not revisited on appellate review. To the extent that

this case supports a market participant exception to the foreign affairs power, however, we disagree.

17. Massachusetts has waived its argument under *Printz* and *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Massachusetts raises this argument only in a brief footnote. We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived. *See, e.g., Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 36 (1st Cir.1994) (argument raised by way of "cursory footnote" deemed waived); *Rumford Pharmacy, Inc. v. City of East Providence,* 970 F.2d 996, 1000 n. 9 (1st Cir.1992) ("As appellant presents its contention in a cursory and conclusory footnote reference it merits no independent dis-

in any event. Massachusetts suggests that the Tenth Amendment prevents the courts and Congress from imposing regulatory burdens on the states that are not borne by private persons, and that states cannot be compelled to administer a federal regulatory program. *Cf. Printz v. United States,* 521 U.S. 898, 933–35, 117 S.Ct. 2365, 2384, 138 L.Ed.2d 914 (1997); *New York v. United States,* 505 U.S. 144, 178–80, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Massachusetts argues that the effect of the district court decision is to compel Massachusetts to engage in commerce with members of the NFTC. These arguments miss their mark: even if Massachusetts were being compelled to deal with firms that do business in Burma, such compulsion is not similar to the federal government compulsion of states found impermissible in *New York* and *Printz.*

■ Massachusetts also contends that a state's purchasing decisions "lie[ ] at the core of state sovereignty" and thus fall within the area protected by the Tenth Amendment, and that the Massachusetts law is an "expression of a moral position on an important issue of public policy." We do not view these arguments as distinct from Massachusetts's claim that the law reflects important state interests that, under *Zschernig,* must be balanced against the federal government's foreign affairs power. Even where they exist, strong state interests do not make an otherwise unconstitutional law constitutional.

c. *The Massachusetts Burma Law is Not Shielded by the First Amendment*

■ Massachusetts also argues that, regardless of the effect of *Zschernig* on the Massachusetts Burma Law, the law is protected by the First Amendment. At oral argument, Massachusetts stated that it is not actually contending that the First Amendment protects its law or that the Commonwealth has First Amendment rights. Instead, Massachusetts argues that First Amendment values should weigh in favor of a finding that Massachusetts has significant interests at stake here, interests that should be considered under *Zschernig.* Although a few district courts in other circuits have found that local governments do have First Amendment rights, *see, e.g., County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1387, 1390 (E.D.N.Y.1989), *aff'd,* 907 F.2d 1295 (2d Cir.1990), the First Circuit has expressed doubt, holding that a legal services office of a state university lacks such rights and saying that "a state entity[ ] itself has no First Amendment rights," *Student Gov't Ass'n v. Board of Trustees,* 868 F.2d 473, 481 (1st Cir.1989). Nothing in *Zschernig* suggests that a state government's First Amendment interests, if any, should weigh into a consideration of whether a state has impermissibly interfered with the federal government's foreign affairs power.[18]

## III

■ The foreign affairs power is, of course, not the only aspect of the Constitution at work in the foreign affairs arena. In addition to the foreign affairs power, the Commerce Clause grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. "It has long been understood, as well, to provide 'protection from state legislation inimical to the national commerce [even] where Congress has not acted....'" *Barclays,* 512 U.S. at 310, 114 S.Ct. 2268 (alterations

cussion." (citations omitted)); *Barrett v. United States,* 965 F.2d 1184, 1194 n. 19 (1st Cir.1992) ("Since petitioner merely adverts to the claim in a perfunctory fashion in a footnote, and without developed argumentation, the claim is deemed waived." (internal quotation marks omitted)).

18. We do not consider here whether Massachusetts would be authorized to pass a resolution condemning Burma's human rights record but taking no other action with regard to Burma.

in original) (quoting *Southern Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 769, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945)). The NFTC argues that, regardless of whether the Massachusetts Burma Law violates the foreign affairs power, the law violates the dormant Commerce Clause. Massachusetts responds that it is a market participant, and that the market participant exception that the Supreme Court has recognized in its dormant domestic Commerce Clause analysis should be applied to the Foreign Commerce Clause. Even if the exception does not apply, Massachusetts further contends, the law still does not violate the Foreign Commerce Clause. The district court did not reach these arguments. *See National Foreign Trade Council*, 26 F.Supp.2d at 293.

We examine these claims in three stages. First, applying dormant domestic Commerce Clause caselaw, we find that Massachusetts is not a market participant when it acts pursuant to the Massachusetts Burma Law. Second, we examine whether, in any event, the market participant exception should be extended to the Foreign Commerce Clause. Third, we find that the Massachusetts law violates the Foreign Commerce Clause.

### 1. *Massachusetts is Not Acting as a Market Participant*

■ Massachusetts says that it is exempt from any Foreign Commerce Clause scrutiny because it is a market participant and not a market regulator. Massachusetts relies on the Supreme Court's domestic Commerce Clause decisions in *White v. Massachusetts Council of Construction Employers, Inc.*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), *Reeves, Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), and *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). These cases establish that "if a State is acting as a market participant, rather than as a market regulator, the dormant Commerce Clause places no limitation on its activi-

ties." *South–Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 93, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (plurality opinion of White, J.); *see also White*, 460 U.S. at 214–15, 103 S.Ct. 1042; *Reeves*, 447 U.S. at 436–37, 100 S.Ct. 2271; *Alexandria Scrap*, 426 U.S. at 810, 96 S.Ct. 2488. We will assume arguendo that there is a market participant exception under the Foreign Commerce Clause and test whether Massachusetts is acting as a market participant or as a market regulator.

■ Even applying domestic market participant doctrine in this context, we hold that Massachusetts has not acted as a mere market participant. The Supreme Court first recognized the domestic market participant exception in *Alexandria Scrap*, upholding a Maryland law that imposed extra documentation requirements on out-of-state processors of scrap metal who sought to receive bounties from the state for converting junk cars into scrap. *See Alexandria Scrap*, 426 U.S. at 800–01, 814, 96 S.Ct. 2488. In *Reeves*, the Court upheld South Dakota's decision to sell cement from a state-owned plant only to state residents during a cement shortage. *See Reeves*, 447 U.S. at 432–34, 446–47, 100 S.Ct. 2271. The cases bearing most directly on the issue here are the Supreme Court's subsequent decisions in *White*, *South–Central Timber*, and *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997).

In *White*, the Supreme Court upheld against a domestic Commerce Clause challenge a mayoral order that required at least half of the workforce to be Boston residents on projects funded partially or entirely by Boston city funds. The Court commented that there was no evidence that the executive order in question was an " 'attempt to force virtually all businesses that benefit in some way from the economic ripple effect' of the city's decision to enter into contracts for construction projects 'to bias their employment practices in favor of the [city's] residents.' " *White*,

460 U.S. at 211, 103 S.Ct. 1042 (alteration in original) (quoting *Hicklin v. Orbeck*, 437 U.S. 518, 531, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978)).

In *South–Central Timber*, the Supreme Court held that the domestic market participant doctrine has limits. The Court held that the state of Alaska, as a seller of timber, could not require that timber from state lands be processed within the state before being exported, and said that the market participant doctrine does not permit a state to impose extensive conditions on firms with which the state does business: "Although the Court in *Reeves* did strongly endorse the right of a State to deal with whomever it chooses when it participates in the market, it did not—and did not purport to—sanction the imposition of any terms that the State might desire." *South–Central Timber*, 467 U.S. at 95–96, 104 S.Ct. 2237 (plurality opinion of White, J.). The plurality added that the "doctrine is not *carte blanche* to impose any conditions that the State has the economic power to dictate, and does not validate any requirement merely because the State imposes it upon someone with whom it is in contractual privity." *Id.* at 97, 104 S.Ct. 2237. The plurality noted that Alaska was not just participating in the market, for "the seller usually has no say over, and no interest in, how the product is to be used after sale," *id.* at 96, 104 S.Ct. 2237, and that "[u]nless the 'market' [in the market participation doctrine] is relatively narrowly defined, the doctrine has the potential of swallowing up the rule that States may not impose substantial burdens on interstate commerce even if they act with the permissible state purpose of fostering local industry," *id.* at 97–98, 104 S.Ct. 2237. "In sum, the State may not avail itself of the market-participant doctrine to immunize its downstream regulation of [a] market in which it is not a participant." *Id.* at 99, 104 S.Ct. 2237.

More recently, in *Camps Newfound/Owatonna*, the Court again rejected an attempt to use the market participant exception to shield state conduct from domestic Commerce Clause scrutiny. The Court said that the market participant exception is a narrow one, noting that *Reeves* and *Alexandria Scrap* both involved "a discrete activity focused on a single industry." *Camps Newfound/Owatonna, Inc.*, 520 U.S. at 594, 117 S.Ct. 1590. The Court invalidated a Maine statute that granted more limited tax benefits to non-profit organizations largely serving non-residents than to organizations primarily serving Maine residents. *See id.* at 567–69, 594–95, 117 S.Ct. 1590. The Court warned against an expansion of the market participant exception that "would swallow the rule against discriminatory tax schemes." *Id.* at 594, 117 S.Ct. 1590. Maine's tax exemption, it said, "must be viewed as action taken in the State's sovereign capacity rather than a proprietary decision to make an entry into all of the markets in which the exempted charities function." *Id.*

We find that in enacting the Massachusetts Burma Law the Commonwealth has crossed over the line from market participant to market regulator. Massachusetts contends that its law is akin to the Boston order upheld in *White*. But *White* involved an attempt to dictate the employment of Boston residents in projects funded by the city; it did not involve an attempt by Boston to require all contractors with the city to employ Boston residents in all of their other projects, a situation more akin to this case. Here, Massachusetts is attempting to impose on companies with which it does business conditions that apply to activities not even remotely connected to such companies' interactions with Massachusetts.

Massachusetts attempts to distinguish its law from the controlling Supreme Court precedent. Massachusetts notes that *South–Central Timber* involved an attempt to impose a downstream restriction on timber. Indeed, the Alaska regulation there at issue imposed a "restriction on

private economic activity [that took] place after the completion of the parties' direct commercial obligations, rather than during the course of an ongoing commercial relationship in which the [state actor] retained a continuing proprietary interest in the subject of the contract." *South–Central Timber*, 467 U.S. at 99, 104 S.Ct. 2237 (plurality opinion of White, J.). In contrast, Massachusetts contends, its law does not attempt to impose limits after the completion of a contract. Massachusetts is technically correct that firms are free to engage in business with Burma once their contracts with Massachusetts are completed. But this distinction is hollow: the Massachusetts law, by creating a selective purchasing list, creates a mechanism to monitor the ongoing activities of private actors. This monitoring is not limited to individual purchasing decisions. Further, Massachusetts is attempting to regulate unrelated activities of its contractors once a contract is signed but before its performance is completed. Massachusetts also attempts to regulate unrelated activities of anyone negotiating with the state or responding to a request for bids. Importantly, the Massachusetts Burma Law applies to conduct not even remotely linked to Massachusetts. It imposes restrictions on markets other than the market for state procurement contracts. Under *South–Central Timber*, states may not use the market participant exception to shield otherwise impermissible regulatory behavior that goes beyond ordinary private market conduct.

 Massachusetts also argues that the effects of its law are not relevant to the inquiry into whether it is acting as a regulator. Massachusetts notes that the Supreme Court has found that states were acting as market participants even when they pursued goals not directly linked to

local economic well-being. Massachusetts is correct that in *Alexandria Scrap* the Supreme Court permitted Maryland to act as a market participant to pursue environmental concerns. *See Alexandria Scrap*, 426 U.S. at 809, 814, 96 S.Ct. 2488; *see also* L. Tribe, *Constitutional Choices* 144 (1985) (noting that *Alexandria Scrap* and *Reeves* involved situations in which states "intended their entrances [into the market] to affect the flow of commerce so as to enhance *public* values" (emphasis in original)). Yet this is not enough to save a law that regulates activity outside of Massachusetts that is not related to the seller's interactions with Massachusetts. As the Supreme Court has explained, *Alexandria Scrap*, *Reeves*, and *White* stand for the proposition that "under the dormant Commerce Clause, a State acting in its proprietary capacity as a purchaser or seller may 'favor its own citizens over others.'" *Camps Newfound/Owatonna*, 520 U.S. at 592–93, 117 S.Ct. 1590 (quoting *Alexandria Scrap*, 426 U.S. at 810, 96 S.Ct. 2488).[19] But this doctrine does not permit Massachusetts to pursue goals that are not designed to favor its citizens or to secure local benefits. *Cf. Air Transport Ass'n of Am. v. City and County of San Francisco*, 992 F.Supp. 1149, 1163 (N.D.Cal.1998).

Massachusetts's action is also invalid under *Wisconsin Department of Industry, Labor and Human Relations v. Gould Inc.*, 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), in which the Supreme Court held that Wisconsin was not acting as a market participant when it refused to purchase products from repeated violators of the National Labor Relations Act. *See id.* at 289, 106 S.Ct. 1057. The Court found that "Wisconsin's debarment scheme is tantamount to regulation," *id.*, as the law could not "even plausibly be defended as a legitimate response to state procure-

19. Massachusetts contends that *Camps Newfound/Owatonna* actually supports Massachusetts's position. The Court in *Camps Newfound/Owatonna* distinguished between the Maine tax law at issue and laws that involve direct state purchases of goods. *See Camps*

*Newfound/Owatonna*, 520 U.S. at 594, 117 S.Ct. 1590. This reference, however, does not support the contention that all state purchasing decisions are protected by the market participant exception.

ment constraints or to local economic needs, or [as] a law that pursues a task Congress intended to leave to the States," *id.* at 291, 106 S.Ct. 1057. In *Building & Construction Trades Council v. Associated Builders & Contractors,* 507 U.S. 218, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993), the Court stated that *"Gould* makes clear" that "[w]hen the State acts as regulator, it performs a role that is characteristically a governmental rather than a private role." *Id.* at 229, 113 S.Ct. 1190.

Attempting to distinguish *Gould,* Massachusetts argues that *Gould* was concerned primarily with the NLRA's preemption of state law and that *Gould* involved punishment of companies for past actions. Massachusetts protests that under the Massachusetts Burma Law the Commonwealth is imposing conditions on current activities— and thus companies can respond by changing their practices. *Cf. Board of Trustees,* 562 A.2d at 751 (distinguishing *Gould* ). Under *Gould* and *South–Central Timber,* however, state regulations that go beyond the scope of normal market participation are not immune from Commerce Clause scrutiny. Massachusetts's desire to eliminate moral taint that it claims it suffers from dealing with firms that do business in Burma does not permit it to act to regulate activities beyond its borders.

 Massachusetts contends that it acts as private actors do because some companies have ceased doing business with Burma due to human rights concerns. The NFTC, in turn, argues that these companies have not ceased doing business with other *companies* that remain involved in Burma. Even if certain companies ceased purchasing goods from companies that maintain investments in Burma, such a fact would not be sufficient to lead us to consider the Massachusetts Burma Law to be market participation. The proper inquiry is whether Massachusetts is acting as an ordinary market participant would act, not whether any participant has acted in such a fashion. Massachusetts has created a market, but it cannot regulate the

market that it has created so as to regulate conduct elsewhere not related to that market. As the NFTC noted at oral argument, Massachusetts's action here is akin to prohibiting purchases from companies that do business in states that have policies with which Massachusetts disagrees. This would plainly be unconstitutional under the domestic Commerce Clause. Massachusetts surely cannot do the same in the international context, as state actions that affect international commerce receive even greater scrutiny than do actions that affect interstate commerce. *See Japan Line,* 441 U.S. at 448, 99 S.Ct. 1813.

2. *It is Unlikely that the Market Participant Exception Applies to the Foreign Commerce Clause*

 Our finding that Massachusetts is not acting as a market participant means that the Massachusetts law must be subjected to ordinary Foreign Commerce Clause analysis. Yet there is likely an additional reason that the Massachusetts law is not shielded from Foreign Commerce Clause scrutiny: we are skeptical of whether the market participation exception applies at all (or without a much higher level of scrutiny) to the Foreign Commerce Clause.

The Supreme Court has not resolved this issue. In *Reeves,* the Court commented that "[w]e have no occasion to explore the limits imposed on state proprietary actions by the 'foreign commerce' Clause" but added that such "scrutiny may well be more rigorous when a restraint on foreign commerce is alleged." *Reeves,* 447 U.S. at 437 n. 9, 100 S.Ct. 2271; *see also South–Central Timber,* 467 U.S. at 92 n. 7, 104 S.Ct. 2237 (expressing concern about the international ramifications of Alaska's challenged timber policy).

Massachusetts's argument relies on the decisions in *Trojan Technologies, Inc.,* 916 F.2d at 912, *Board of Trustees,* 562 A.2d at 752–53, and *K.S.B. Technical Sales Corp.,* 381 A.2d at 788. *Cf.* Tribe, *American Constitutional Law* § 6–21, at 469 (2d

ed.1988) (noting that while state laws banning private individuals or companies from doing business with South Africa would be invalid under *Zschernig*, "under the Supreme Court's market participant exception to the commerce clause, a state would be free to pass ... rules requiring that purchases of goods and services by and for the state government be made only from companies that have divested themselves of South African commercial involvement" (footnote omitted)). Massachusetts urges us to follow *Trojan Technologies, Board of Trustees,* and *K.S.B. Technical Sales Corp.* We decline to do so.

The Supreme Court has repeatedly suggested that state regulations that touch on foreign commerce receive a greater degree of scrutiny than do regulations that affect only domestic commerce. *See South–Central Timber,* 467 U.S. at 96, 104 S.Ct. 2237; *Reeves,* 447 U.S. at 437 n. 9, 100 S.Ct. 2271; *Japan Line,* 441 U.S. at 448, 99 S.Ct. 1813 (noting that "there is evidence that the Founders intended the scope of the foreign commerce power to be ... greater" than that of the domestic commerce power). Contrary to the Third Circuit's view in *Trojan Technologies,* we believe that the risks inherent in state regulation of foreign commerce—including the risk of retaliation against the nation as a whole and the weakening of the federal government's ability to speak with one voice in foreign affairs, *see Japan Line,* 441 U.S. at 450–51, 99 S.Ct. 1813—weigh against extending the market participation exception to the Foreign Commerce Clause. When it comes to state actions that touch on foreign affairs, "[a] foreign government has little inclination to discern whether a burdensome action taken by a political subdivision of the United States was taken under a proprietary or a regulatory guise," and "the potential for the creation of friction between the United States and a foreign nation is not lessened because the state acts as a proprietor instead of a regulator." K. Lewis, *Dealing With South Africa: The Constitutionality of State and Local Divestment Legisla-* *tion,* 61 Tul.L.Rev. 469, 485 (1987). To extend the market participant doctrine would be to ignore these additional risks that arise in the foreign commerce context. But the issues are complex and we choose to leave their resolution to another day and another case.

3. *The Massachusetts Burma Law Violates the Foreign Commerce Clause*

▆▆▆▆ Because the market participation exception does not shield the Massachusetts Burma Law from Commerce Clause scrutiny, we must turn to whether the law does indeed violate the Foreign Commerce Clause. "Absent a compelling justification ... a State may not advance its legitimate goals by means that facially discriminate against foreign commerce." *Kraft General Foods, Inc. v. Iowa Dept. of Revenue & Finance,* 505 U.S. 71, 81, 112 S.Ct. 2365, 120 L.Ed.2d 59 (1992). Like the dormant domestic Commerce Clause, which has the "core purpose ... [of] prevent[ing] states and their political subdivisions from promulgating protectionist policies," *Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 188 (1st Cir. 1999), the Foreign Commerce Clause restricts protectionist policies, but it also restrains the states from excessive interference in foreign affairs.

The crucial inquiry in this case is whether the Massachusetts Burma Law is facially discriminatory. The NFTC does not claim that the law is invalid as applied under the balancing test set forth in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

▆▆▆▆ Massachusetts puts forth two arguments to support its claim that its law does not violate the Foreign Commerce Clause. First, Massachusetts contends that the law does not discriminate between domestic and foreign companies. Second, Massachusetts argues that its law does not impair the federal government's ability to speak with one voice regarding foreign commerce. Under standard Commerce

Clause analysis, a statute that facially discriminates against interstate or foreign commerce will, in most cases, be found unconstitutional. *See, e.g., Oregon Waste Systems, Inc. v. Department of Environmental Quality,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) ("If a restriction on commerce is discriminatory, it is virtually *per se* invalid. By contrast, nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. 844) (emphasis in original) (citation omitted)). Even under that analysis, we find that the law is discriminatory and violates the Foreign Commerce Clause. Although the law does not discriminate against foreign companies, it does discriminate against foreign commerce. Also, the law impedes the federal government's ability to speak with one voice in foreign affairs, and amounts to an attempt to regulate conduct outside of Massachusetts and outside of this country's borders. For these three reasons, we hold that the Massachusetts law violates the Foreign Commerce Clause.

a. *The Massachusetts Burma Law Facially Discriminates Against Foreign Commerce*

Massachusetts first argues that its law does not actually discriminate against foreign commerce, primarily because the law does not distinguish between foreign and domestic companies. Massachusetts relies on *Oregon Waste Systems* and *Kraft.* In *Oregon Waste Systems,* the Supreme Court said that the domestic Commerce Clause "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Systems,* 511 U.S. at 98, 114 S.Ct. 1345. In *Kraft,* the Supreme Court invalidated as facially discriminatory a state tax scheme that treated dividends from foreign subsidiaries less favorably than dividends from

domestic subsidiaries. *See Kraft,* 505 U.S. at 74–77, 82, 112 S.Ct. 2365. Massachusetts contends that these cases support its argument that a law must distinguish between foreign and domestic producers in order to be held facially invalid. That is not the test. Massachusetts also argues that the crucial factor in determining whether a law discriminates is not whether the law singles out a particular foreign state, but rather whether it discriminates "in favor of in-state businesses." *Board of Trustees,* 562 A.2d at 754 n. 56. That is also not the test.

■ A law need not be designed to further local economic interests in order to run afoul of the Commerce Clause. The Supreme Court has said, "[o]ur cases ... indicate that where discrimination is patent, as it is here, neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown." *New Energy Co. v. Limbach,* 486 U.S. 269, 276, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988). In *Kraft,* the Supreme Court explicitly rejected the argument that local favoritism is crucial to a finding that a law is facially discriminatory, stating that it was "not persuaded ... that such favoritism is an essential element of a violation of the Foreign Commerce Clause. ... As the absence of local benefit does not eliminate the international implications of the discrimination, it cannot exempt such discrimination from Commerce Clause prohibitions." *Kraft,* 505 U.S. at 79, 112 S.Ct. 2365.

■ Nor does the law's applicability to both foreign and domestic companies save it. Supreme Court decisions under the Foreign Commerce Clause have made it clear that state laws that are designed to limit trade with a specific foreign nation are precisely one type of law that the Foreign Commerce Clause is designed to prevent. In *Container Corp.,* the Supreme Court stated that state legislation that relates to foreign policy questions violates the Foreign Commerce Clause "if it

*either* implicates foreign policy issues which must be left to the Federal Government or violates a clear federal directive." *Container Corp.*, 463 U.S. at 194, 103 S.Ct. 2933 (emphasis in original); *see also Japan Line*, 441 U.S. at 448–49, 99 S.Ct. 1813 (stating that "[f]oreign commerce is preeminently a matter of national concern" and noting that "[t]he need for federal uniformity is no less paramount in ascertaining the negative implication of Congress' power to 'regulate Commerce with foreign Nations' under the Commerce Clause"). "If state action touching foreign commerce is to be allowed, it must be shown not to affect national concerns to any significant degree, a far more difficult task than in the case of interstate commerce." Tribe, *American Constitutional Law* § 6–21, at 469. Although the Court in *Container Corp.* stated that a state law would not be held invalid if it had only "foreign resonances," *Container Corp.*, 463 U.S. at 194, 103 S.Ct. 2933, Massachusetts's law clearly has more than just foreign resonances. Indeed, a chief goal of the Massachusetts law is to affect business decisions pertaining to a foreign nation.

■ The Massachusetts Burma Law discriminates against two subsets of foreign commerce—that involving companies or persons organized or operating in Burma and that involving companies or persons doing business with Burma. The law is thus a direct attempt to regulate the flow of foreign commerce. Massachusetts's arguments miss a crucial point. When the Constitution speaks of foreign commerce, it is not referring only to attempts to regulate the conduct of foreign companies; it is *also* referring to attempts to restrict the actions of American companies overseas. Long-standing Supreme Court precedent indicates that the Framers were concerned with "discriminations favorable or adverse to commerce with particular foreign nations [under] state laws." *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 317, 13 L.Ed. 996 (1851).

### b. The Massachusetts Burma Law Interferes with the Ability of the Federal Government to Speak with One Voice

■ The NFTC's argument that the Massachusetts Burma Law violates the Commerce Clause because it interferes with the federal government's ability to speak with one voice is similar to, but distinct from, the argument that the law violates the foreign affairs power of the federal government. Independent of any claim under *Zschernig,* the Supreme Court decisions in *Japan Line* and *Container Corp.* make clear that a state law can violate the dormant Foreign Commerce Clause by impeding the federal government's ability to "speak with one voice" in foreign affairs, because such state action harms "federal uniformity in an area where federal uniformity is essential." *Japan Line*, 441 U.S. at 448–49, 99 S.Ct. 1813; *see also Container Corp.*, 463 U.S. at 193, 103 S.Ct. 2933.

Massachusetts contends that *Barclays* "severely undercuts, if not eliminates" the Commerce Clause "one voice" test. Massachusetts also argues that *Barclays* demonstrates that the one voice test has never actually forbidden voices other than that of the federal government, and that while the federal government has the last word on foreign affairs—and thus can preempt the Massachusetts law—it does not have the only word.

Massachusetts misreads *Barclays.* Rather than dismantling the one voice test, *Barclays* applied this test. The Court found, however, that since Congress had effectively condoned the challenged law, the Court could not conclude that the California worldwide reporting requirement impeded the ability of the federal government to speak with one voice. *See Barclays*, 512 U.S. at 328–30, 114 S.Ct. 2268. *Barclays* reached this determination in light of repeated congressional consideration of the precise issue at hand and in light of the fact that the challenged law did

not directly regulate foreign commerce.[20] Nothing in *Barclays* suggests that we should reduce the amount of scrutiny that a state law that directly regulates foreign commerce should receive.

### c. *Massachusetts is Attempting to Regulate Conduct Beyond Its Borders*

The Massachusetts Burma Law violates the Foreign Commerce Clause for an additional reason: Massachusetts is attempting to regulate conduct beyond its borders and beyond the borders of this country. In the domestic Commerce Clause arena, the Supreme Court has held that "one State's power to impose burdens on the interstate market ... is not only subordinate to the federal power over interstate commerce but is also constrained by the need to respect the interests of other States," and that "it follows from ... principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing ... lawful conduct in other States." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 571–72, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (citation omitted). In *Brown–Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), the Court invalidated a New York law that required that wholesale prices of alcohol in New York not exceed the lowest price at which the seller would sell the same product in any other state. *See id.* at 575–78, 106 S.Ct. 2080. The Court held that the fact that the law was "addressed only to sales of liquor in New York is irrelevant if the 'practical effect' of the law is to control liquor prices in other States." *Id.* at 583,

106 S.Ct. 2080 (quoting *Southern Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 775, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945)). The Massachusetts statute does not meet even these standards because both the intention and effect of the statute is to change conduct beyond Massachusetts's borders.

Massachusetts is in no better position because it seeks in part to change conduct not only outside Massachusetts, but also outside the United States. *Cf. Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 333–34, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964) (equating state attempts to control commerce flowing into foreign countries with attempts to control commerce flowing into a federal enclave). Massachusetts may not regulate conduct wholly beyond its borders. Yet the Massachusetts Burma Law—by conditioning state procurement decisions on conduct that occurs in Burma—does just that. *Cf. Healy v. Beer Institute*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) ("The Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." (alteration in original) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (plurality opinion)) (internal quotation marks omitted)).[21] The "critical inquiry" here is "whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336, 109 S.Ct. 2491. Because we find that the Massachusetts Burma Law has such an effect, and is not otherwise shielded by the market par-

**20.** We further discuss the significant factual, procedural, and substantive differences between *Barclays* and this case below in our discussion of Massachusetts's claim that Congress has implicitly permitted the Massachusetts Burma Law.

**21.** Massachusetts points to *Scariano v. Justices of the Supreme Court of Indiana*, 38 F.3d 920 (7th Cir.1994), to support its argument that where extraterritorial effects are not in-

evitable, there is no Foreign Commerce Clause violation. That case involved a challenge to Indiana's rules exempting out-of-state practitioners from Indiana's bar exam only if they had practiced predominately in Indiana for five years. The court found that this law had, at most, de minimis extraterritorial effects. *See id.* at 922, 927. That case thus has little relevance to the issues in this case.

ticipant exception, we find that the law violates the Foreign Commerce Clause.

 Massachusetts cannot save its law by protesting that a company doing business with Burma can simply forgo contracts with Massachusetts, or simply beat the next highest bidder's price by ten percent. Every discriminatory state law can be avoided by withdrawing from the enacting state. In *Healy*, for example, liquor distributors could have avoided the New York law by staying out of the New York liquor market. To allow state laws to stand on this ground, however, would be to read the Commerce Clause out of the Constitution. Moreover, the relative influence of a state's purchasing power cannot suffice to save discriminatory legislation. If Massachusetts can enact a Burma law, so too can California or Texas. Finally, we have no reason to view a ten-percent bidding penalty as anything other than an effective exclusion from the bidding process.

### d. *Massachusetts Has Failed to Put Forth a Legitimate Local Justification in Support of its Law*

 Given that the Massachusetts Burma Law discriminates on its face against foreign commerce, it can survive Commerce Clause scrutiny only if it is "demonstrably justified" because it "advances a legitimate local purpose that can-

not be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co.*, 486 U.S. at 274, 278, 108 S.Ct. 1803. Massachusetts, having made its primary arguments on other grounds, provides no support under either domestic or Foreign Commerce Clause jurisprudence for the proposition that a state's expression of moral concerns can provide a valid basis for a discriminatory law.[22] Even if expression of moral outrage about foreign human rights concerns were a valid *local* purpose, Massachusetts would need to show that it has no less discriminatory means of expressing its outrage. It has not done so, or even attempted to do so.

The NFTC argues that the Supreme Court has made clear that the only facially discriminatory laws that survive domestic Commerce Clause scrutiny are laws designed to protect a state's natural resources or the health and safety of its citizens. *Cf. Maine v. Taylor*, 477 U.S. 131, 151, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986); *Oregon Waste Systems*, 511 U.S. at 101, 114 S.Ct. 1345. Regardless of any such limits in the Commerce Clause context, as discussed above, Massachusetts's attempt to justify this statute as falling within traditional areas of *state* concern is unconvincing. The Supreme Court has recognized a number of disparate topics and fields of law as traditional areas of state concern,[23] but has not suggested that moral concerns regarding human rights

---

**22.** Amici curiae Center for Constitutional Rights et al. cite to *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940), and *Trap Rock Industries, Inc. v. Kohl*, 59 N.J. 471, 284 A.2d 161 (1971), to support their contention that a state's moral concerns can be a sufficient ground to justify laws such as the Massachusetts Burma Law. Yet neither case addressed a law that facially discriminated against interstate or foreign commerce. *Perkins* dismissed, for lack of standing, a challenge to the Secretary of Labor's determinations of wage localities under a statute requiring federal contractors to pay the prevailing local minimum wage. *See Perkins*, 310 U.S. at 116–17, 125–27, 60 S.Ct. 869. In *Trap Rock*, the New Jersey Supreme Court upheld the New Jersey Commissioner of Transportation's decision to bar firms, including a low bidder, from bidding on state contracts after

the firms' principals were indicted on bribery charges. *See Trap Rock*, 284 A.2d at 163–64. Citing *Perkins* and emphasizing the state government's broad discretion in purchasing decisions, the court found that the Commissioner had acted within his statutory discretion. *Id.* at 164, 168, 172. Like *Perkins*, however, *Trap Rock* bears no relation to this case. It is by now well understood that a state can, through its purchasing practices, pursue a variety of objectives, as long as its actions do not violate other laws or the Constitution. *See, e.g., Foto USA, Inc. v. Board of Regents of the Univ. Sys. of Florida*, 141 F.3d 1032, 1036–37 (11th Cir.1998).

**23.** *See, e.g., California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 330, 334, 117 S.Ct. 832, 136

conditions abroad—though effectuated via state procurement policy—are such an area. The argument that there is a *local* purpose that cannot otherwise be adequately served is very weak and does not suffice.

## IV

■ The NFTC contends that the Massachusetts Burma Law is preempted by the Federal Burma Law, and thus violates the Supremacy Clause. Massachusetts contends both that Congress has implicitly permitted the law and that, in any event, the federal sanctions do not preempt the Massachusetts law. We reject Massachusetts's claim that Congress has permitted the law and find that Congress has preempted the law.

The district court found that the NFTC "failed to carry [its] burden" of showing "that Congress intended to exercise its authority to set aside a state law." *National Foreign Trade Council,* 26 F.Supp.2d at 293. The district court rejected the NFTC's claim that the Massachusetts law reflected a unilateral approach to trade with Burma, one that conflicted with federal law's endorsement of a multilateral strategy. The court based this finding on its determination that the federal statute "actually provides for unilateral sanctions against [Burma]." *Id.* In so doing, the district court misapprehended NFTC's burden and applied an erroneous legal standard to the facts.

1. *Congress Has Not Implicitly Approved of or Permitted the Massachusetts Law*

Massachusetts attempts to preclude an inquiry into whether its law is preempted by the Federal Burma Law by arguing that Congress, fully aware of the Massachusetts law when it considered federal sanctions against Burma, failed explicitly to preempt the state law and thus impliedly permitted it. Massachusetts again relies on the Supreme Court's opinion in *Barclays,* arguing that Congress's failure explicitly to preempt the law shields the law from constitutional scrutiny. We reject Massachusetts's argument.

As it had done in *Container Corp.,* 463 U.S. at 196–97, 103 S.Ct. 2933, and *Wardair,* 477 U.S. at 6–7, 106 S.Ct. 2369, the Supreme Court in *Barclays* looked for indicia that Congress had acted to preempt the state practices in dispute. Noting that Congress was fully aware of foreign government opposition to state combined reporting requirements, *see Barclays,* 512 U.S. at 324, 114 S.Ct. 2268, that the Court itself had ruled favorably to the state on the issue in a previous case, *see id.* at 321–22, 114 S.Ct. 2268, and that Congress had "on many occasions studied state taxation of multinational enterprises," *id.* at 324–25, 114 S.Ct. 2268, including consideration of proposed legislation that would have prohibited California's reporting requirements, *see id.* at 325, 114 S.Ct. 2268, the Court stated that "Congress implicitly has *permitted* the States to use the worldwide combined reporting method," *id.* at 326, 114 S.Ct. 2268 (emphasis in original); *see also id.* at 329, 114 S.Ct. 2268 ("Congress has focused its attention on this issue, but has refrained from exercising its authority to prohibit state-mandated worldwide combined reporting."). *Barclays* made clear

L.Ed.2d 791 (1997) (prevailing-wage law); *General Motors Corp. v. Tracy,* 519 U.S. 278, 294, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (regulation of local gas franchises); *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 649–50, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (regulation of hospital billing); *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 544, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (real property); *Northwest Cent. Pipeline Corp. v.*

*State Corp. Com'n of Kansas,* 489 U.S. 493, 510–12, 514, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989) (natural resources); *Rose v. Rose,* 481 U.S. 619, 626, 628, 107 S.Ct. 2029, 95 L.Ed.2d 599 (1987) (domestic relations); *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 742–44, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (insurance); *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (weights and measures on product packaging).

that determining "whether the national interest is best served by tax uniformity, or state autonomy," was a decision best left to Congress, not the courts. *Id.* at 331, 114 S.Ct. 2268; *see also Container Corp.*, 463 U.S. at 194, 103 S.Ct. 2933 ("This Court has little competence in determining precisely when foreign nations will be offended by particular acts, and even less competence in deciding how to balance a particular risk of retaliation against the sovereign right of the United States as a whole to let the States tax as they please."). The posture of Congress here is nothing like the position of Congress recounted in *Barclays*.

Massachusetts notes that, in addition to failing to indicate a desire to preempt in the Federal Burma Law, Congress has debated the appropriateness of state and local actions concerning Burma, but has not passed legislation explicitly preempting state and local selective purchasing laws. *See* 144 Cong. Rec. H7,277–H7,285 (daily ed. Aug. 5, 1998). Massachusetts's argument is supported by amici curiae members of Congress in support of reversal, who contend that "Congress is well aware of the criticism being directed at the Massachusetts law and other state and local purchasing measures," and who point to repeated testimony regarding the issue before congressional subcommittees. These amici curiae also state that Congress's failure to address state and local measures, either when it enacted the federal sanctions against Burma or when it considered legislation reforming federal sanctions law, *see* H.R. 2708, 105th Cong. (1997), was intentional. Massachusetts's argument is opposed by other amici curiae who are also members of Congress, who say that the Massachusetts law threatens to destroy the carefully crafted federal scheme of sanctions against Burma, and who argue that Congress lacks the ability to monitor the legislative activities of the fifty states and thousands of municipalities in this country to determine whether laws of such jurisdictions are harming the nation's foreign policy.

We do not believe that *Barclays* applies to the facts of this case, for four reasons. First, the discussion of preemption in *Barclays* came as part of a Commerce Clause inquiry into whether the challenged law impaired the federal government's ability to speak with one voice. The California law was not challenged under the Supremacy Clause. *Barclays* commented that "there is no claim here that the federal tax statutes themselves provide the necessary pre-emptive force." *Barclays*, 512 U.S. at 321, 114 S.Ct. 2268 (quoting *Container Corp.*, 463 U.S. at 196, 103 S.Ct. 2933) (internal quotation marks omitted). *Barclays* thus did not discuss how courts should address Supremacy Clause challenges to state laws that impact foreign affairs, such as the Massachusetts Burma Law.

Second, *Barclays* involved an area of traditional state activity: taxation of companies which do business within the state and elsewhere and the appropriate allocation to the state of such companies' income. The California law had few direct foreign policy implications and was not structured so as to affect conduct beyond the borders of the state.

Third, the clarity and frequency in *Barclays* of the refusal of Congress to act, despite a host of bills and a Supreme Court decision, is vastly different than the situation we face in this case. In *Barclays*, Congress had been put on notice by the Court's prior decision in *Container Corp.* and had considered "numerous bills [that] ... would have prohibited the California reporting requirement." *Id.* at 325, 114 S.Ct. 2268. In contrast, Congress never formally voted on provisions that would have explicitly preempted the Massachusetts law. The *Barclays* discussion of implied permission involved only a Commerce Clause inquiry into whether state laws are preempted by the need for the nation to speak with one voice in foreign affairs. Massachusetts has given us no reason to extend *Barclays* to the different

facts we face here, and we decline to do so.[24]

Fourth, although *Barclays* involved congressional silence, Congress has not been silent about Burma. The real question is not what to infer from congressional inaction, but how to interpret the action that Congress has already taken in enacting sanctions against Burma.

## 2. The Massachusetts Burma Law is Preempted by Federal Sanctions Against Burma

■ We address the question of whether the Federal Burma Law preempts Massachusetts's law by examining the usual indicia of congressional intent where there is no express preemption statement. Congressional intent to preempt may be found where a federal statute is so pervasive as to occupy the field, *see Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992), where it would be physically impossible to comply with both the federal and the state law, *see Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or where enforcement of the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, 61 S.Ct. 399.

■ If the subject matter of the law in question is an area traditionally occupied by the states, congressional intent to preempt must be "clear and manifest." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). The district court, relying on a domestic commerce clause case, stated that "[p]laintiff's burden is particularly

heavy." *National Foreign Trade Council,* 26 F.Supp.2d at 293. This was error.

Preemption will be more easily found where states legislate in areas traditionally reserved to the federal government, and in particular where state laws touch on foreign affairs. The test which should be applied is set forth in *Hines*.

In *Hines*, the Supreme Court found that Pennsylvania's Alien Registration Act was preempted by the federal Alien Registration Act. The Court stated that "[n]o state can add to or take from the force and effect of [a] treaty or statute [regarding aliens]." *Hines*, 312 U.S. at 63, 61 S.Ct. 399. The Court commented:

> [T]he regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, "the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it." And where the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations.

*Id.* at 66–67, 61 S.Ct. 399 (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)) (footnote omitted). Likewise, in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Court, considering the liability of an independent contractor who had supplied a military helicopter to the United States, commented that when

---

**24.** The fact that *Barclays* looked to congressional inaction only in order to inquire into whether the law impeded the federal government's ability to speak with one voice highlights the weakness in Massachusetts's additional claim that, given the *Barclays* presumption, this court should not even commence an inquiry into the validity of the

Massachusetts law under the Commerce Clause. In *Barclays*, as "[i]n both *Wardair* and *Container Corp.*, the Court considered the 'one voice' argument only after determining that the challenged state action was otherwise constitutional." *Barclays*, 512 U.S. at 323, 114 S.Ct. 2268.

considering "an area of uniquely federal interest," a "conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates 'in a field which the States have traditionally occupied.'" *Id.* at 507, 108 S.Ct. 2510 (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. 1146).[25]

*Hines* and its progeny establish that preemption is much more easily found when Congress has passed legislation relating to foreign affairs. The Supreme Court has repeatedly cited *Hines* for the proposition that an "Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981); *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 157, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 633, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); *Rice,* 331 U.S. at 230, 67 S.Ct. 1146. Other cases make the same point using similar language. *See, e.g., Hillsborough County,* 471 U.S. at 713, 105 S.Ct. 2371; *Pennsylvania v. Nelson,* 350 U.S. 497, 504, 76 S.Ct. 477, 100 L.Ed. 640 (1956).

The Supreme Court, distinguishing *Hines* in considering a state labor law, explained:

> [In *Hines* ] we were dealing with a problem which had an impact on the general field of foreign relations. The delicacy of the issues which were posed alone raised grave questions as to the propriety of allowing a state system of regulation to function alongside of a federal system. In that field, any "concurrent state power that may exist is restricted to the narrowest of limits." Therefore, we were more ready to conclude that a federal Act in a field that touched international relations superseded state regulation than we were in those cases where a State was exercising its historic powers over such traditionally local matters as public safety and order and the use of streets and highways.

*Allen–Bradley Local No. 1111 v. Wisconsin Employment Relations Bd.,* 315 U.S. 740, 749, 62 S.Ct. 820, 86 L.Ed. 1154 (1942) (quoting *Hines,* 312 U.S. at 68, 61 S.Ct. 399) (citation omitted).

Massachusetts argues that the ordinary clear statement rule regarding congressional intent to preempt should apply because state procurement is a traditional area of state power reserved to the states by the Tenth Amendment. *Cf. Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("[I]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)) (internal quotation marks omitted)). This argument is no more convincing here than it is in the context of Massachusetts's claim that its Tenth Amendment interests shield its law from scrutiny under *Zschernig.* Massachusetts argues that "state procurement is not an area of unique federal interest" (internal quotation marks omitted), but ignores the fact that its law, like the federal sanctions against Burma, is aimed primarily at effecting change in and expressing disapproval of the current regime in Burma. Similarly, the fact that Congress has at times explicitly preempted local sanctions, *see, e.g.,* 50 U.S.C. app. § 2407(c)

---

**25.** Professor Tribe makes the same point:

> [I]f the field is one that is traditionally deemed "national," the Court is more vigilant in striking down state incursions into subjects that Congress may have reserved to itself. It was not surprising, therefore, that the Court invalidated the state alien registration law in *Hines v. Davidowitz;* the Court was extremely solicitous of the paramount federal interest in matters germane to foreign affairs.

Tribe, *American Constitutional Law* § 6–27, at 500 (footnote omitted).

(West 1991) (stating that federal provisions prohibiting United States persons from complying with foreign boycotts against nations with which the United States maintains friendly relations preempted state and local laws, regulations, and rules), does not prevent our finding of preemption where Congress has not spoken so directly. To do otherwise would be to ignore *Hines*.

Massachusetts attempts to distinguish this case from *Hines* by relying on *De Canas v. Bica*, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). *De Canas* concerned a California law forbidding employers from "knowingly employ[ing] an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers." *Id.* at 352, 96 S.Ct. 933 (quoting Cal. Labor Code § 2805(a)) (internal quotation marks omitted). The Supreme Court found that the Immigration and Nationality Act, while a "comprehensive federal statutory scheme for regulation of immigration and naturalization," nevertheless did not preempt the California law. *Id.* at 353–54, 96 S.Ct. 933. To reach this conclusion, however, the Court first assumed that the California statute "only applie[d] to aliens who would not be permitted to work in the United States under pertinent federal laws and regulations." *Id.* at 353 n. 2, 96 S.Ct. 933. Thus, the California law simply "adopt[ed] federal standards in imposing criminal sanctions against state employers who knowingly employ aliens who have no federal right to employment within the country." *Id.* at 355, 96 S.Ct. 933.

In contrast, Massachusetts is attempting to regulate the same conduct—trade with Burma—addressed by the Federal Burma Law, but is doing so by imposing distinct restrictions different in scope and kind from the federal law. Some actions lawful under federal law would be unlawful under the state statute. The Massachusetts law is therefore akin to a hypothetical California statute prohibiting employment of any aliens, even those allowed to work under federal law. The *De Canas* Court considered, and rejected, such laws. *See id.* at 358 n. 6, 96 S.Ct. 933. California acted to regulate employment, an area where states "possess broad authority under their police powers." *Id.* at 356, 96 S.Ct. 933. Massachusetts is not acting under its traditional state police powers.[26]

**26.** Additionally, the *De Canas* Court considered only whether a state could punish *employers* for hiring employees who were in the country in violation of federal law. California was attempting to regulate different behavior than was regulated under the INA—the hiring of illegal aliens, rather than the illegal entry of aliens into the United States. As *De Canas* noted, "[t]he central concern of the INA [was] with the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country," not with barring employment of illegal aliens. *De Canas*, 424 U.S. at 359, 96 S.Ct. 933. Unlike in *Hines*, where Congress had acted "in the specific field which the States were attempting to regulate," *id.* at 362, 96 S.Ct. 933, in *De Canas* there was "no indication that Congress intended [the INA] to preclude state law in the area of employment regulation," *id.* The Massachusetts Burma Law, in contrast, clearly lies in the same field and governs the same conduct—investment in and trade with Burma—as the federal sanctions against Burma.

Massachusetts also argues that *Itel Containers International Corp. v. Huddleston*, 507 U.S. 60, 113 S.Ct. 1095, 122 L.Ed.2d 421 (1993), distinguishes this case from *Hines*. The petitioner in *Itel* leased cargo containers that were solely used in international shipping. Tennessee assessed sales tax on containers that Itel delivered to lessees within the state's borders. Itel based its "primary challenge" to the law on the international Container Conventions, which prohibit taxation of cargo containers used in international trade provided such containers spend no more than three months in the country. *Id.* at 64–65, 113 S.Ct. 1095. Itel argued that the Conventions barred taxation of leases involving these containers.

*Itel Containers* does not support Massachusetts's argument. In *Itel*, as in *De Canas*, the challenged state law fell outside the scope of the federal regulatory scheme. The Conventions were adopted to ensure the free flow of containers, and encouraged more efficient containerization in lieu of other, less efficient transportation techniques. Because the tax did not impede importation of containers into Tennessee, the tax was not barred by the

*Hines* and its progeny mean that when Congress legislates in an area of foreign relations, there is a strong presumption that it intended to preempt the field, in particular where the federal legislation does not touch on a traditional area of state concern. Under this standard we find that Congress has preempted the Massachusetts Burma Law. Congress has constructed a reasonably comprehensive statute covering a field of foreign relations. But even if Congress had not been so comprehensive, the state law would still conflict with the federal law. "The basic subject of the state and federal laws is identical," *Hines,* 312 U.S. at 61, 61 S.Ct. 399, but Massachusetts's law veers from the carefully balanced path that Congress has constructed. Congress is attempting to balance various concerns and is "trying to steer a middle path." *Id.* at 73, 61 S.Ct. 399. In enacting sanctions against Burma, Congress attempted to strike at least two sorts of balances. First, Congress sought to improve human rights in Burma, but did so in the context of this country's overall foreign relations, including, at the least, the United States' experiences with human rights practices elsewhere, this country's relationships with its trading partners, its economic interests, and its interest in forming alliances rather than taking unilateral actions. Second, Congress considered various mechanisms to accomplish and balance this country's various interests and goals and chose a set of carefully calibrated tools. This careful calibration reflects the judgment of the Congress and the President that the federal choice of tools is the most effective means to improve human rights conditions in Burma while safeguarding other national interests. Massachusetts, in contrast, has chosen a blunt instrument to further only a single goal, making judgments different from and contrary to the judgments made by Congress and the President.

Congress considered and rejected barring all United States investment in Burma, *see* S. 1092, 104th Cong. (1995), instead choosing to limit only new investment in the "development of resources." In contrast, the Massachusetts law applies to virtually all investment in Burma. The Federal Burma Law permits some trade with Burma, while the Massachusetts law does not. For example, the Federal Burma Law does not sanction companies for merely having subsidiaries with operations in Burma, having been organized in Burma, being a majority-owned franchise of a company with Burma operations, or being a United States subsidiary or a foreign company that engages in business in Burma. The Massachusetts law does.

The Massachusetts law thus regulates conduct not covered by the federal law and applies to parties, including foreign companies, not covered by the federal law. As in *Hines,* the Massachusetts law therefore has effects more inimical to foreign interests than those of the federal law. The Massachusetts law penalizes the activities of foreign companies which are lawful under the laws of those companies' home countries and are not prohibited by trade agreements with the United States or by United States federal law. In addition, the federal law provides for sanctions to be terminated upon a finding by the President that human rights conditions in Burma have improved; the Massachusetts Burma Law has no such provision. In the Federal Burma Law, Congress has chosen to rely on both carrots and sticks. Massachusetts uses a cudgel. In doing so, Massachusetts risks upsetting Congress's careful choice of tools and strategy.

Additionally, Massachusetts's unilateral strategy toward Burma directly contradicts the federal law's encouragement of a multilateral strategy. That the federal government has itself at times acted uni-

---

conventions. *See id.* at 66, 113 S.Ct. 1095. Moreover, there was no evidence that Congress intended to displace generally applica-

ble state tax schemes. *See id.* at 70, 113 S.Ct. 1095.

laterally in its approach to Burma, or has created a mechanism that allows the President to fine-tune the federal government's approach, does not eliminate the fact that Massachusetts's unilateral sanctions are inconsistent with the federal regime. *Cf.* 142 Cong. Rec. S8753 (daily ed. July 25, 1996) (stating that the United States "maintain[s] a range of unilateral sanctions [against] Burma"). The Massachusetts law directly conflicts with Congress's instruction that the federal government pursue a multilateral strategy with regard to Burma. It is of little importance that some companies can comply with both federal and state laws regarding Burma. Massachusetts's argument to this effect resembles the argument made by the three dissenters in *Hines, see Hines,* 312 U.S. at 81, 61 S.Ct. 399 (Stone, J., dissenting), an argument that the *Hines* majority implicitly rejected, *see Hines,* 312 U.S. at 68, 61 S.Ct. 399 (majority opinion) ("Any concurrent state power that may exist is restricted to the narrowest of limits; the state's power here is not bottomed on the same broad base as is its power to tax."). Finally, the fact that Congress may have been aware of the Massachusetts law at the time it passed the Federal Burma Law does not lead to a different outcome. In *Hines,* nineteen states had passed alien registration laws prior to Congress's passage of the federal law, *see id.,* at 79, 61 S.Ct. 399 (Stone, J., dissenting), yet the Supreme Court nevertheless did not conclude from earlier congressional inaction that these laws were not preempted.[27]

Massachusetts protests that the goals of its statute—promoting change in Burma and expressing disapproval of conditions in Burma—are the same as those of the federal legislation, and thus that there can be no conflict between the Massachusetts law and federal sanctions. Yet the fact that state and federal legislation share common goals, either in whole or in part, is not sufficient to preclude a finding of preemption. *See Gade,* 505 U.S. at 103, 112 S.Ct. 2374. The crucial inquiry is whether a state law impedes the federal effort. *See Gould,* 475 U.S. at 286, 106 S.Ct. 1057; *International Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). Where, as here, the federal government has acted in an area of unique federal concern and has crafted a balanced, tailored approach to an issue, and the state law threatens to upset that balance, the state law is preempted. Under the Supremacy Clause, the Massachusetts Burma Law is unconstitutional. *Cf. Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920).

## V

The passage of the Massachusetts Burma Law has resulted in significant attention being brought to the Burmese government's human rights record. Indeed, it may be that the Massachusetts law was a catalyst for federal sanctions. Massachusetts also played a role, through its representatives in the House and the Senate, in Congress's decision to impose sanctions on Burma. Nonetheless, the conduct of this nation's foreign affairs cannot be effectively managed on behalf of all of the nation's citizens if each of the many state and local governments pursues its own foreign policy. Absent express congressional authorization, Massachusetts cannot set the nation's foreign policy.[28]

---

27. Massachusetts argues that the only court to have confronted a similar question, the Maryland court in *Board of Trustees,* found that federal sanctions against South Africa did not preempt local divestment ordinances. The Maryland case is weak precedent here, however, as the Maryland court did not consider *Hines* in its discussion of preemption. *See Board of Trustees,* 562 A.2d at 740-44.

28. We acknowledge with appreciation the able advocacy by counsel for the parties as well as the assistance provided by the fourteen briefs representing more than 100 amici curiae.

The judgment of the district court is *affirmed*.